In re Marguerite KEPKA, Individually and as Representative of the Estate of William G. Kepka, Deceased, Relator.

No. 01–05–00115–CV.

Court of Appeals of Texas, Houston (1st Dist.).

July 28, 2005.

 

Joshua Bernstein and Melvin H. Wolovits, Dallas, TX, for Relator.

John Thomas Wooldridge, Houston, TX, for Respondent.

John C. Marshall, Marshall & McCracken, P.C., Houston, TX, for Other Interested Party.

Panel consists of Justices TAFT, KEYES, and HANKS.

## OPINION

TIM TAFT, Justice.

Relator, Marguerite Kepka, individually and as representative of the estate of her deceased husband, William G. Kepka, seeks a writ of mandamus ordering the trial court[1] to vacate its November 10, 2004 order staying trial-court proceedings and compelling arbitration of all of her claims against the real party in interest, Living Centers of Texas d/b/a Southfield Healthcare Center ("Southfield"). We determine whether (1) federal law pre-empted state law governing certain arbitration agreements in the healthcare context and (2) Southfield carried its initial burden of showing that Ms. Kepka agreed to arbitrate her wrongful-death claim, which she asserted in her individual capacity. We conditionally grant the writ.

### Background

Mr. Kepka was admitted to Southfield's nursing home on November 22, 2002.[2] In admitting her husband, Ms. Kepka signed multiple documents, including a document entitled Agreement for Arbitration ("the arbitration agreement"). The arbitration agreement provided in pertinent part as follows (the italicized text indicates provisions that the parties entered in handwriting; the bolded text indicates our emphasis):

II. AGREEMENT

The following is an agreement to arbitrate **any dispute** that might arise between *William Kepka* ("Resident") **and/or** *Marguerite Kepka* ("Legal Representative") and *Southfield* ("Facility") ("Facility" includes the particular facility where the Resident resides, its parents, affiliates, subsidiary companies, owners, officers, directors, medical directors, em-

---

1. The Honorable John Wooldridge, Judge of the 269th District Court of Harris County. The underlying cause is *Marguerite Kepka, Individually & as Representative of the Estate of William G. Kepka v. Living Centers of Texas, Inc. d/b/a Southfield Healthcare Center; Thandavarajan Gopalakrishnan, M.D. d/b/a South-* *belt Medical Clinic; & Virginia Chan, A.N.P.,* No. 2004–09415.

2. In her petition, Ms. Kepka alleged that her husband had previously been diagnosed with early-onset Alzheimer's disease and diabetes.

ployees, successors, assigns, agents, attorneys, and insurers). The parties expressly agree and voluntarily enter into this binding Arbitration Agreement (the "Agreement"). The **Resident and the Facility** have entered into an Admission Agreement and acknowledge that such Admission Agreement constitutes the foundation of the relationship between them and all duties and obligations arising **between them**.... This Agreement shall not apply to any dispute where the amount in controversy is less than two hundred thousand ($200,000.00) dollars.

In consideration of this binding Agreement, **the Facility and the Resident** acknowledge that they are agreeing to a mutual arbitration, regardless of which party is making a claim; that the Facility agrees to pay the fees of the arbitrators and up to $5,000.00 of reasonable and appropriate attorney's fees and costs for the Resident in any claims against the Facility....

**The parties** agree that they shall submit to binding arbitration all disputes against each other **and their representatives, affiliates, governing bodies, agents and employees arising out of or in any way related or connected to the Admission Agreement and all matters related thereto including matters involving the Resident's stay and care provided at the Facility, including but not limited to any disputes concerning alleged personal injury to the Resident caused by improper or inadequate care including allegations of medical malpractice;** any disputes concerning whether any statutory provisions relating to the Resident's rights under Texas law were violated; any disputes relating to the payment or nonpayment for the Resident's care and stay at the Facility; **and any other dispute under state or Federal law based on** contract, **tort,** statute (includ-

ing any deceptive trade practices and consumer protection statutes), warranty or any alleged breach, default, **negligence, wantonness,** fraud, misrepresentation or suppression of fact or inducement.

. . .

**It is the intention of the Facility and the Resident that this Agreement shall inure to the benefit of and bind** the Facility, its parents, affiliates, and subsidiary companies, owners, officers, representatives, directors, medical directors, employees, successors, assigns, agents, attorneys and insurers; **the Resident, his/her successors, assigns, agents, attorneys, insurers, heirs, trustees, and representatives, including the personal representative or executor of his or her estate;** and **the Legal Representative, his/her successors, assigns, agents, attorneys, insurers, heirs, trustees, and representatives or executor of his or her estate.**

. . .

## III. ACKNOWLEDGMENTS

The execution of this Agreement is not a precondition to receiving medical treatment or for admission to the Facility.

The Resident **and/or** Legal Representative understand(s) that he/she has the right to consult with an attorney of his/her choice, prior to signing this agreement, to receive explanations or clarification of any of the terms of this Agreement.

The Resident **and/or** Legal Representative understand(s), agree(s) to, and has received a copy of this Agreement, and acknowledges that the terms have been explained to him/her, or his/her designee, by a representative of the Facility, and that he/she has had an oppor-

tunity to ask questions about this Agreement.

Each party agrees to waive the right to a trial, before a judge or jury, **for all disputes,** including those at law or in equity, subject to binding arbitration under this Agreement.

The Resident **and/or** Legal Representative understand(s) that this agreement may be rescinded by giving written notice to the Facility within 30 days of signature. If not rescinded within 30 days of signature, this Agreement shall remain in effect **for all claims arising out of the Resident's stay at the Facility** . . . .

THE UNDERSIGNED ACKNOWLEDGE THAT EACH OF THEM HAS READ THIS ENTIRE AGREEMENT AND UNDERSTANDS THAT BY SIGNING THIS AGREEMENT EACH HAS WAIVED HIS/HER RIGHT TO A TRIAL, BEFORE A JUDGE OR JURY, AND THAT EACH OF THEM VOLUNTARILY CONSENTS TO ALL OF THE TERMS OF THE AGREEMENT.

---

Signature of Resident/Date

*[signature] 11–21–02*
Signature of Facility Representative/Date

*/s/ M. Kepka 11–21–02*
**Signature of Legal Representative/Date (if signing on behalf of Resident)**

---

**Signature of Legal Representative/Date (if signing on his or her own behalf)**

The arbitration agreement further provided that the Federal Arbitration Act[3] ("FAA") would apply.[4]

On December 8, 2002, Mr. Kepka died. On August 19, 2003, Ms. Kepka sent Southfield written notice that she intended to file suit under former Revised Civil Statute article 4590i ("former article 4590i"). *See* Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, 2039–64, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884 (current version at Tex. Civ. Prac. & Rem.Code Ann. § 74.001–.507 (Vernon Supp.2004–2005)). Nine days later, Ms. Kepka sued Southfield, Dr. Thandavarajan Gopalakrishnan d/b/a Southbelt Medical Clinic, and Virginia Chan, A.N.P. for negligence and gross negligence arising out of Mr. Kepka's care at the nursing home.[5] Ms. Kepka asserted her negligence claims under the Texas survival statute[6] and the Texas wrongful-death statute.[7] For her wrongful-death negligence claim, Ms. Kepka alleged that she, personally, had been damaged and sought compensation for pecuniary loss, loss of companionship and society, mental anguish, and loss of inheritance. Ms. Kepka also sought exemplary damages.

Southfield first moved to compel arbitration and to dismiss or to stay trial proceedings on July 1, 2004. Ms. Kepka opposed

---

3. *See* 9 U.S.C.S. §§ 1–16 (West 1997 & Supp. 2005).

4. Accordingly, the FAA undisputedly applied to the arbitration agreement. *See In re Kellogg Brown & Root,* 80 S.W.3d 611, 617 (Tex. App.-Houston [1st Dist.] 2002, orig. proceeding); *see also In re Nexion Health at Humble, Inc.,* No. 04–0360,173 S.W.3d 67, 68 (Tex. 2005) (holding that "the evidence of Medicare payments made to [the health-care center defendant] on [the decedent's] behalf is suffi-

cient to establish interstate commerce and the FAA's application in this case.").

5. Gopalakrishnan and Chan are not parties to this original proceeding.

6. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 71.021–.022 (Vernon 1997 & Supp.2004–2005).

7. *See id.* §§ 71.001–.012 (Vernon 1997 & Supp.2004–2005).

Southfield's motion on various grounds. On August 20, 2004, after having held a hearing, the trial court denied Southfield's motion to compel arbitration without specifying the grounds for its ruling. Upon Southfield's motion for reconsideration, however, the trial court granted the motion to compel arbitration on November 10, 2004, again without stating the grounds for its ruling; stayed the cause pending the conclusion of arbitration; and sent both Ms. Kepka's wrongful-death and survival-statute claims against Southfield to arbitration. It is from the November 10 order that Ms. Kepka seeks mandamus relief.

### Standard of Review

■ Mandamus is an appropriate means to review an order granting a motion to compel arbitration, whether the FAA or the Texas General Arbitration Act[8] ("TAA") applies to the arbitration agreement. *Mohamed v. Auto Nation USA Corp.*, 89 S.W.3d 830, 834 (Tex. App.-Houston [1st Dist.] 2002, no writ) (combined appeal & orig. proceeding). In this mandamus proceeding, we review the trial court's order compelling arbitration for a clear abuse of discretion. *See TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex.1991); *see also Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 271 (Tex.1992). A trial court abuses its discretion when it errs in determining what the law is or in applying the law to the facts. *In re Bruce Terminix Co.*, 988 S.W.2d 702, 703 (Tex.1998).

### The Law Applicable to Arbitration

■ A party seeking to compel arbitration has the initial burden both (1) to establish the arbitration agreement's existence and (2) to show that the claims asserted against the movant fall within the arbitration agreement's scope. *Mohamed*, 89 S.W.3d at 835.

■ "Whether an enforceable agreement to arbitrate exists is a legal question entitled to *de novo* review." *Id.* Part of the moving party's initial burden of establishing the arbitration agreement's existence is to show that the entity against whom it seeks enforcement is a party to the agreement or is nonetheless bound by the agreement. *See id.* ("'A party cannot be required to arbitrate unless it has agreed to do so.'") (quoting *Trico Marine Servs., Inc. v. Stewart & Stevenson Technical Servs.*, 73 S.W.3d 545, 548 (Tex. App.-Houston [1st Dist.] 2002, no pet.) (combined appeal & orig. proceeding)); *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073–74 (5th Cir.2002) (considering question of "who must arbitrate" to be aspect of movant's burden of showing valid agreement to arbitrate); *cf. Mohamed*, 89 S.W.3d at 836 (holding, "The initial burden of the party seeking to compel arbitration—to establish the arbitration agreement's existence—includes proving the entity seeking to enforce the arbitration agreement was a party to it or had the right to enforce the agreement notwithstanding"; also holding, "An entity's burden to prove it is a signatory exists because arbitration is a creature of contract...."). Moreover, although there exists a strong presumption favoring arbitration, "the presumption arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex.2003); *Gaskamp*, 280 F.3d at 1073 & 1073 n. 5 (stating, "In determining whether the dispute falls within the scope of the arbitration agreement, 'ambiguities are resolved in favor of arbitration.' However, this federal policy favoring arbitration does not

---

8. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 171.001–.098 (Vernon Supp.2004–2005).

apply to the determination of whether there is a valid agreement to arbitrate between the parties ....."; further holding, "[T]he federal policy favoring arbitration does not extend to a determination of who is bound ....") (citations omitted). Additionally, " '[t]he parties' agreement to arbitrate must be clear. In this determination, Texas contract law applies' "; the determination involves a question of law if the agreement is unambiguous. *Mohamed*, 89 S.W.3d at 835 (quoting *Trico Marine Servs.*, 73 S.W.3d at 548).

 To carry its other initial burden of showing that the claims asserted against it fall within the arbitration agreement's scope—when, as here, the arbitration agreement uses broad language such as "arising out of or in any way related or connected to" to define the scope of arbitrability—the moving party must show that the factual allegations against it "touch matters" covered by the underlying agreement. *Hou–Scape, Inc. v. Lloyd*, 945 S.W.2d 202, 205–06 (Tex.App.-Houston [1st Dist.] 1997, orig. proceeding). There is a strong federal policy favoring arbitration. *Id.* at 205 (applying federal law to determine scope of arbitration agreement because FAA applied). "An order to arbitrate should not be denied unless it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* Accordingly, "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.*

 "If the party seeking arbitration carries its initial burden, the burden then shifts to the party resisting arbitration to present evidence on its defenses to the arbitration agreement." *Mohamed*, 89 S.W.3d at 835.

## Effect of Failure to Comply with Former Article 4509i, Section 15.01

In issues one through four, Ms. Kepka asserts that the entire arbitration agreement was invalid, and thus that the trial court erred in sending either of her claims to arbitration, for four reasons. We need address only Ms. Kepka's issues two and four.

In issue two, Ms. Kepka asserts that the trial court abused its discretion in sending both of her claims to arbitration because the arbitration agreement did not comply with former article 4590i, section 15.01's requirements concerning arbitration agreements. *See* Act of May 25, 1993, 73rd Leg., R.S., ch. 625, § 4, 1993 Tex. Gen. Laws 2347, 2349–50, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884 (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 74.451 (Vernon Supp.2004–2005)). Former 4590i, section 15.01(a) provided, in pertinent part:

(a) No physician, professional association of physicians, or other health care provider shall request or require a patient or prospective patient to execute an agreement to arbitrate a health care liability claim unless the form of agreement delivered to the patient contains a written notice in 10–point boldface type clearly and conspicuously stating:

UNDER TEXAS LAW, THIS AGREEMENT IS INVALID AND OF NO LEGAL EFFECT UNLESS IT IS ALSO SIGNED BY AN ATTORNEY OF YOUR OWN CHOOSING. THIS AGREEMENT CONTAINS A WAIVER OF IMPORTANT LEGAL RIGHTS, INCLUDING YOUR RIGHT TO A JURY. YOU SHOULD NOT SIGN THIS AGREEMENT WITHOUT

FIRST CONSULTING WITH AN ATTORNEY.

*Id.* No one disputes that the arbitration agreement did not comply with former 4590i, section 15.01(a).

Rather, Southfield asserts (as it did below) that the FAA, which does not contain the specific requirement quoted above, pre-empts former 4590i, section 15.01(a); accordingly, Southfield argues that the arbitration agreement was enforceable under the FAA despite its not complying with this Texas statute. Ms. Kepka did not dispute below, and does not contest in this Court, Southfield's assertion that the FAA pre-empts former 4590i, section 15.01(a)'s requirements quoted above.[9] Instead, in issue four, Ms. Kepka asserts that another federal statute—the McCarran–Ferguson Act[10] ("the MFA")—"reverse pre-empts" the FAA, preventing the FAA from pre-empting former 4590i, section 15.01(a)'s quoted requirements. If we sustain issue four, then we must also sustain issue two; if we overrule issue four, we must also overrule issue two. We thus discuss issue four first.

■■■■ The MFA provides, in pertinent part:

No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for **the purpose of regulating the business of insurance,** or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance; *Provided,* That ... the Act ... known as the Sherman Act, and the Act ... known as the Clayton Act, and the Act ... known as the Federal Trade

Commission Act ... shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

15 U.S.C.S. § 1012(b) (West 1984) (italics in original; bolding added for emphasis). Accordingly, under the first clause quoted above, the MFA will prevent a federal statute from pre-empting a state statute "if '(1) the federal statute does not specifically relate to the "business of insurance," (2) the state law was enacted for "the purpose of regulating the business of insurance," and (3) the federal statute operates to "invalidate, impair, or supersede" the state law.'" *Bodine v. Webb,* 992 S.W.2d 672, 677 (Tex.App.-Austin 1999, pet. denied) (quoting *Munich Am. Reinsurance Co. v. Crawford,* 141 F.3d 585, 590 (5th Cir.1998)). The only element at issue in this case is the second: whether former article 4590i—and specifically, section 15.01—was enacted for the purpose of regulating the business of insurance.

■■■■ "'Statutes aimed at protecting or regulating this relationship [between insurer and insured], directly or indirectly, are laws regulating "the business of insurance,"' within the meaning of" the first clause of MFA section 1012(b), which contains the bolded text above. *United States Dept. of the Treasury v. Fabe,* 508 U.S. 491, 501, 113 S.Ct. 2202, 2208, 124 L.Ed.2d 449 (1993) (quoting *SEC v. Nat'l Secs., Inc.,* 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969)) (bracketed text in original). The emphasis of the MFA's first clause is upon

"[t]he relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation,

---

9. Because we are presented with no challenge on this basis, we must assume without deciding that the FAA would pre-empt former article 4590i, section 15.01(a)'s requirements. *See Walling v. Metcalfe,* 863 S.W.2d 56, 58

(Tex.1993) ("[T]he courts of appeals may not reverse the judgment of a trial court for a reason not raised in a point of error.").

10. *See* 15 U.S.C.S. §§ 1011–15 (West 1984).

and enforcement—these were the core of the 'business of insurance.' Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder."

*Id.* (quoting *Nat'l Secs., Inc.*, 393 U.S. at 460, 89 S.Ct. at 568). "The broad category of laws enacted 'for the purpose of regulating the business of insurance' consists of laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance." *Id.*, 508 U.S. at 505, 113 S.Ct. at 2210 (quoting BLACK'S LAW DICT. 1236, 1286 (6th ed.1990)). There is precedent for examining the particular state act as a whole, rather than just the portion of the act alleged to be in conflict with federal law, when determining whether the state act was enacted "for the purpose of regulating the business of insurance";[11] nonetheless, the U.S. Supreme Court has also held that a state statute was enacted "for the purpose of regulating the business of insurance" under the MFA—and thus that conflicting federal law did not pre-empt the state law—only "to the extent that" the statute was aimed at protecting or regulating the relationship between the insurer and insured.[12]

Ms. Kepka argues that former article 4590i, in its entirety, was enacted "for the purpose of regulating the business of insurance" because the former article's "findings and purposes" section (former article 4590i, section 1.02) indicated that the article was enacted with the purpose of controlling the escalating costs of professional medical liability insurance. Southfield, in contrast, focuses only on section 15.01—the arbitration provision—arguing that the goal of this provision was to regulate the relationship between health providers and their patients by protecting the patients within that relationship, rather than to regulate the business of insurance.

We disagree with Southfield that section 15.01 can be read in a vacuum for the purpose of determining whether it was enacted "for the purpose of regulating the business of insurance." The "findings and purposes" section of former article 4590i (section 1.02) contained legislative statements that applied to the statute as a whole and provided:

(a) The Legislature of the State of Texas finds that:

(1) the number of health care liability claims (frequency) has increased since 1972 inordinately;

(2) the filing of legitimate health care liability claims in Texas is a contributing factor affecting medical professional liability rates;

(3) the amounts being paid out by insurers in judgments and settlements (severity) have likewise increased in-

---

11. *See Crawford*, 141 F.3d at 590, 592 (before considering an Oklahoma statute "in its entirety" for this determination under the MFA, noting that the Second Circuit Court of Appeals had also "refused to limit its focus to the anti-arbitration provision [of the state liquidation law], but instead, examined the Kentucky Liquidation Act as a whole.") (discussing *Stephens v. Am. Int'l Ins.*, 66 F.3d 41, 45 (2nd Cir.1995)).

12. *See United States Dept. of the Treasury v. Fabe*, 508 U.S. 491, 505–06, 508, 113 S.Ct. 2202, 2210, 2212, 124 L.Ed.2d 449 (1993) ("We hold that the Ohio priority statute, to the extent that it regulates policyholders, is a law enacted for the purpose of regulating the business of insurance. To the extent that it is designed to further the interests of other creditors, however, it is not a law enacted for the purpose of regulating the business of insurance.").

ordinately in the same short period of time;

(4) the effect of the above has caused a serious public problem in availability of and affordability of adequate medical professional liability insurance;

(5) the situation has created a medical malpractice insurance crisis in the State of Texas;

(6) this crisis has had a material adverse effect on the delivery of medical and health care in Texas, including significant reductions of availability of medical and health care services to the people of Texas and a likelihood of further reductions in the future;

(7) the crisis has had a substantial impact on the physicians and hospitals of Texas and the cost to physicians and hospitals for adequate medical malpractice insurance has dramatically risen in price, with cost impact on patients and the public;

(8) the direct cost of medical care to the patient and public of Texas has materially increased due to rising cost of malpractice insurance protection for physicians and hospitals in Texas;

(9) the crisis has increased the cost of medical care both directly through fees and indirectly through additional services provided for protection against future suits or claims; and defensive medicine has resulted in increasing cost to patients, private insurers, and the state and has contributed to the general inflation that has marked health care in recent years;

(10) satisfactory insurance coverage for adequate amounts of insurance in this area is often not available at any price;

(11) the combined effect of the defects in the medical, insurance, and legal systems has caused a serious public problem both with respect to the availability of coverage and to the high rates being charged by insurers for medical professional liability insurance to some physicians, health care providers, and hospitals;

(12) the adoption of certain modifications in the medical, insurance, and legal systems, the total effect of which is currently undetermined, may or may not have an effect on the rates charged by insurers for medical professional liability insurance;

. . . .

(b) Because of the conditions stated in Subsection (a) of this section, it is the purpose of this Act to improve and modify the system by which health care liability claims are determined in order to:

(1) reduce excessive frequency and severity of health care liability claims through reasonable improvements and modifications in the Texas insurance, tort, and medical practice systems;

(2) decrease the cost of those claims and assure that awards are rationally related to actual damages;

(3) do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis;

(4) make available to physicians, hospitals, and other health care providers protection against potential liability through the insurance mechanism at reasonably affordable rates;

(5) make affordable medical and health care more accessible and available to the citizens of Texas;

(6) make certain modifications in the medical, insurance, and legal systems in order to determine whether or not there will be an effect on rates charged by insurers for medical professional liability insurance; and

(7) make certain modifications to the liability laws as they relate to health care liability claims only and with an intention of the legislature to not extend or apply such modifications of liability laws to any other area of the Texas legal system or tort law.

See Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02, 1977 Tex. Gen. Laws 2039, 2039–41, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

It is clear from former section 1.02 that the purpose of the *entire statute*—even those substantive provisions that did not expressly mention insurance [13]—was to decrease the costs of health-care liability claims, through modifications of the insurance, tort, and medical-practice systems, in order to make insurance reasonably affordable so that health-care providers could have protection against potential liability and so that citizens could have more affordable and accessible health care. Former article 4590i, section 15.01 was part of this overall scheme: the Legislature not only intended to protect patients by it, but could also have determined that

the section's protections could reduce litigation over arbitration agreements' enforceability—thereby keeping down this aspect of litigation cost. Such an intent is at least consistent with the stated purposes of "reduc[ing] excessive frequency and severity of health care liability claims through reasonable improvements and modifications in the Texas insurance, *tort*, and medical practice systems" and "mak[ing] certain modifications in the medical, insurance, and *legal* systems in order to determine whether or not there will be an effect on rates charged by insurers for medical professional liability insurance." *See* Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02, 1977 Tex. Gen. Laws 2039, 2041 (emphasis added). Therefore, former article 4509i, including its section 15.01, was a "law[ ] enacted 'for the purpose of regulating the business of insurance'" because it "possess[ed] the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance," that is, the relationship between health-care insurers and their insureds (health providers).[14] *Fabe*, 508 U.S. at 505, 113 S.Ct. at 2210.

---

**13.** For example, former article 4590i contained various pleading, procedural, and evidentiary provisions applicable to health-care-liability suits; established a medical-disclosure panel to determine which risks and hazards had to be disclosed by physicians and health-care providers to their patients; set out physicians' and health-care providers' duty toward patients concerning disclosure of risks and hazards involved in medical care; provided for certain jury-charge instructions; capped certain damages; established a statute of limitations; provided for computation of pre-judgment interest; provided for adjustments for advance payments by co-defendants; and required certain notices in arbitration agreements between physicians and health-care providers and their patients.

**14.** We distinguish the authority on which Southfield relies. First, the court in *Hart v. Orion Insurance Co.* was not considering an

arbitration provision contained within a health-care-liability statute—enacted with the principal purpose of effecting medical-liability-insurance premiums—when it held that the MFA did not reverse pre-empt the FAA, but was instead considering state arbitration statutes of general application. 453 F.2d 1358, 1360 (10th Cir.1971). Second, the U.S. Supreme Court authority—establishing a narrower test for determining what constitutes the "business of insurance"—does not apply in this suit. *See Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982); *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 210–14, 99 S.Ct. 1067, 1072–75, 59 L.Ed.2d 261 (1979). In those cases, the Supreme Court was considering the meaning of "business of insurance" in the *second* clause of MFA section 1012(b), rather than the meaning of "the purpose of regulating the business of insurance" in the first clause of

We draw support for our conclusion from the holding of the Colorado Supreme Court in *Allen v. Pacheco,* on which Ms. Kepka relies, that the Colorado Health Care Availability Act ("the Colorado statute") was enacted for the purpose of regulating the business of insurance within the meaning of the MFA, so that the FAA did not pre-empt the Colorado statute's provision concerning arbitration agreements. *See* 71 P.3d 375, 383–84 (Co.2003). We realize that *Pacheco* is distinguishable to the extent that the Colorado statute provided that:

> [i]t is the intent of the general assembly that an arbitration agreement be a voluntary agreement between a patient and a health care provider and *no medical malpractice insurer shall require a health care provider to utilize arbitration agreements as a condition of providing medical malpractice insurance to such health care provider. Making the use of arbitration agreements a condition to the provision of medical malpractice insurance* shall constitute an unfair insurance practice . . . [15]

and because the court was considering an arbitration agreement between a health-maintenance organization ("HMO") and its individual insured, reasoning that "HMOs simultaneously function as health care providers and health care insurers." "Given the modern reality that HMOs have virtually replaced traditional health care insurers, the relationship between an HMO 'medical service provider' and 'patient' is the relationship between a 'medical insurer' and 'insured.' " *Id.* at 383 n. 9. Nonetheless, the *Pacheco* court also held that

> the fact that [the Colorado statute's arbitration provision sections] apply to "health care providers" instead of exclusively to insurers such as HMOs does not nullify our conclusion that [these] sections . . . were enacted for the "purpose of regulating the business of insurance." As long as the statute is not one of general applicability, it is not necessary that the state statute relate only to insurance or that the statute be in the form of an insurance code. *Therefore, the fact that [these] sections technically include non-insurer "health care providers" such as physicians does not prevent these sections of the [Colorado statute] from qualifying as statutes enacted "for the purpose of regulating the business of insurance" under the meaning of the McCarran–Ferguson Act.*

*Id.* at 383–84 (emphasis added; citation omitted).

Accordingly, we hold that the MFA prevents the FAA from pre-empting former article 4590i, section 15.01(a)'s arbitration notice requirements.[16] We thus further hold that the trial court abused its discretion in implicitly concluding that former article 4590i, section 15.01(a)'s notice requirements (1) were pre-empted by the

---

the same section. The Supreme Court itself has stated that the first clause's "the purpose of regulating the business of insurance" is much broader than the second clause's "business of insurance" and, in interpreting the former clause, has declined to rely on its own precedent interpreting the latter clause. *U.S. Dep't of Treasury v. Fabe,* 508 U.S. 491, 504 & n. 6, 113 S.Ct. 2202, 2209–10 & n. 6, 124 L.Ed.2d 449 (1993) (distinguishing *Pireno* and *Royal Drug* on this basis). Finally, *Triton Lines, Inc. v. Steamship Underwriting Ass'n* pre-dated *Fabe* and applied a test that was more restrictive than the test adopted in *Fabe* for determining "the purpose of regulating the business of insurance." 707 F.Supp. 277, 279 (S.D.Tex.1989).

**15.** Colo.Rev.Stat. § 13–64–403 (2005) (emphasis added).

**16.** Again, because relator does so, we must assume without deciding that the FAA could pre-empt former article 4590i, section 15.01(a)'s arbitration notice requirements.

FAA, (2) did not apply to the arbitration agreement, and (3) did not invalidate that agreement. Consequently, we also hold that the trial court erred in ordering either of Ms. Kepka's claims to arbitration.

We sustain issues two and four.

**Wrongful–Death Claim**

Given that the above issue is one of first impression, we also discuss an alternative challenge raised by Ms. Kepka that would provide her part of the relief that she seeks.

■ In her fifth issue, Ms. Kepka first asserts that the trial court abused its discretion in compelling arbitration of her wrongful-death claim because (1) she asserted that claim in her individual capacity and (2) she signed the arbitration agreement only in her representative capacity, not in her individual capacity. She alternatively asserts that the arbitration agreement's scope does not extend to wrongful-death claims because there is no express mention of "death" or "wrongful death claim" in the section setting out the agreement's scope. We need reach only Ms. Kepka's first argument.

**A. Ms. Kepka Was Not a Party to the Arbitration Agreement in Her Individual Capacity**

■ " 'A party cannot be required to arbitrate unless it has agreed to do so.' " *Mohamed,* 89 S.W.3d at 835 (quoting *Trico Marine Servs.,* 73 S.W.3d at 548). It is undisputed that Ms. Kepka signed the arbitration agreement on the line indicating "Signature of Legal Representative/Date (if signing on behalf of Resident)," rather than on the signature line indicating "Signature of Legal Representative/Date (if signing on his or her own behalf)," which Ms. Kepka left blank. It is axiomatic that one signing a contract in her representative capacity is not bound by the contract

in her individual capacity. *See Gracia v. RC Cola–7–Up Bottling Co.,* 667 S.W.2d 517, 519 (Tex.1984) (holding that res judicata did not bar suit by woman in individual capacity when she had signed prior agreed judgment only as next friend of daughter). Ms. Kepka was thus not a party to the arbitration agreement in her individual capacity.

**B. Ms. Kepka, as a Non–Party, Could Not Be Compelled to Arbitrate Her Claims**

■ "Federal courts have recognized six theories, arising out of common principles of contract and agency law, that may bind non-signatories to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel; and (6) third-party beneficiary." *In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 739 (Tex. 2005) (indicating, "Our decision today rests on state law, but it is informed by persuasive and well-reasoned federal precedent" such as that quoted above for determining when a non-signatory may be compelled to arbitrate); *see In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 755–56 (Tex.2001) (holding non-signatory is subject to contract's arbitration provision when non-signatory sues based on contract to which arbitration provision is part); *In re Rangel,* 45 S.W.3d 783, 787 (Tex.App.-Waco 2001, orig. proceeding) (holding that non-signatory third-party beneficiary of contract containing arbitration clause may be required to arbitrate its claims). Southfield neither argued any of these grounds for requiring Ms. Kepka to arbitrate her claims to the trial court, nor asserts them in this Court. Indeed, on the record presented to us, none of the six cited theories appears to apply. Rather, Southfield asserts that

Ms. Kepka's argument that the [arbitration] Agreement was not signed in her individual capacity is without merit. As mentioned above, Ms. Kepka's voluntary assent to arbitrate "any claim" is binding in her capacity as representative of the Estate of Mr. Kepka. Conversely, the signatory line for Ms. Kepka to sign in her individual capacity would apply to a hypothetical situation where she slipped and fell while visiting a resident at the facility. Stated differently, a premises liability issue in her individual capacity would not apply or in any way be borne out of Mr. Kepka's treatment which is governed by the admission agreement to which the [arbitration] Agreement was incorporated. Therefore, unless Ms. Kepka is suing in tort for an individual injury she sustained which is unrelated to care provided to Mr. Kepka, her argument would simply not apply.

When Ms. Kepka signed in her representative capacity, she signed as her husband's agent, nothing more. We know this because the arbitration agreement (1) had a separate signature line that allowed Ms. Kepka to sign in her individual capacity (and she left that line blank) and (2) repeatedly indicated that the agreement was between the Facility and either "the Resident [Mr. Kepka] and/or the Legal Representative [Ms. Kepka]." Because it contained these two signature lines, and because it allowed the agreement with the Facility to be with the resident "and/or" his legal representative, the arbitration agreement itself contemplated that one could sign it in a representative capacity, in an individual capacity, or in both capacities.

Wrongful-death claims are personal to the statutory beneficiaries who assert the claims, and recovery for those claims does not benefit the estate. *See* Tex. Civ. Prac. & Rem.Code Ann. § 71.004(a) (Vernon 1997) ("An action to recover damages as provided by this subchapter is for the exclusive benefit of the surviving spouse, children, and parents of the deceased."); *id.* § 71.010(b) (Vernon 1997) ("The damages awarded shall be divided, in shares as found by the jury in its verdict, among the individuals who are entitled to recover and who are alive at that time."); *Shepherd v. Ledford,* 962 S.W.2d 28, 31 (Tex.1998) ("An action to recover damages for wrongful death is for the exclusive benefit of the deceased's surviving spouse, children, and parents."); *Palmer v. Coble Wall Trust Co., Inc.,* 851 S.W.2d 178, 181–82 (Tex. 1992) (noting that estate does not benefit from wrongful-death recovery). Because Ms. Kepka did not sign the arbitration agreement in her individual capacity, and because Ms. Kepka's wrongful-death claim was necessarily brought in her individual capacity for damages personal to her, we hold that the trial court abused its discretion in ordering her individual wrongful-death claim to arbitration. Southfield's quoted argument confuses what claims fall within the arbitration agreement's scope with who can be bound by the agreement: we cannot consider what categories of Ms. Kepka's individual claims fall within the agreement's scope if she was not even a signatory to the agreement in that capacity.

■ The arbitration agreement did provide, however, that it would inure to the benefit of "the Resident [Mr. Kepka], his/her successors, assigns, agents, employees, attorneys, insurers, *heirs,* trustees, and representatives, including the personal representative or executor of his or her estate...." (Emphasis added.) No one argues in this Court that Ms. Kepka was a party to the arbitration agreement by virtue of her being an "heir" or her falling under any other category of this

quoted provision. Below, however, Southfield briefly referred the court to *Allen v. Pacheco,* in which the Colorado Supreme Court, based on similar contractual language, held that a non-signatory wife's wrongful-death claim was subject to arbitration under a contract between her deceased husband and his HMO. *See* 71 P.3d at 378–81.

Because the opinion could have been a basis for the trial court's ruling, we again visit the *Pacheco* opinion, this time for its holding on enforcement against a non-signatory. The *Pacheco* court premised this holding on the rule that non-parties *who are in privity with* a signatory may have the agreement enforced against them if the signatories so intend. *Id.* at 379–80 & 380 n. 4. The arbitration agreement in *Pacheco* provided that it covered claims asserted "[b]y a Member, or by *a Member's heir* or personal representative, or by a person claiming that a duty to him or her arises from a Member's relationship with Health Plan, Hospitals or Medical Group incident to this agreement . . . ." *id.* at 377. The court reasoned that the arbitration contract was ambiguous as to whether a surviving wife was intended to be included under the term "heir": the Colorado wrongful-death statute did not include a wife as an "heir," but common usage could. *Id.* at 380. To reach its conclusion that a wife was an "heir" under the arbitration agreement, the *Pacheco* court applied the general rule that any ambiguities in the scope of an arbitration agreement should be resolved in favor of arbitration. *Id.* at 381. Accordingly, the court held that the wife, although a non-signatory, was subject to the arbitration agreement. *Id.* at 381.

 We respectfully decline to follow this holding of *Pacheco.* First, the *Pacheco* court's holding blends together the determination of what claims fall within an agreement's scope and the determination of who can be bound by the agreement. Our state supreme court has held that the presumptions and strong policy favoring arbitration have no application until after the movant has shown the existence of a valid arbitration agreement. *See Webster,* 128 S.W.3d at 227; *see also Gaskamp,* 280 F.3d at 1073 & 1074 n. 5. Part of the burden of showing a valid arbitration agreement's existence is showing that the entity against whom the movant seeks enforcement is either a party to the agreement or a non-party who may nonetheless have the agreement enforced against it. *See Gaskamp,* 280 F.3d at 1073–74; *see also Mohamed,* 89 S.W.3d at 835 (" 'A party cannot be required to arbitrate unless it has agreed to do so.' "). Accordingly, Texas courts would not apply the favorable-to-arbitration presumption that the *Pacheco* court applied to resolve an ambiguity about which non-signatories were bound by the arbitration agreement.

 Second, the term "heir" is not necessarily ambiguous in the context of this arbitration agreement. An arbitration agreement may recognize that certain non-parties who have the appropriate sort of privity with one of the signatories—those such as assignees, agents, subrogated insurers, representatives, trustees, third-party beneficiaries, etc.—are bound by the agreement because those types of non-parties "stand in the shoes" of one of the signatories, are authorized to make decisions on a signatory's behalf or for its benefit, were intended to benefit from the signatories' contract, or the like. *Cf. In re Kellogg Brown & Root, Inc.,* 166 S.W.3d at 738–39 (setting out ways in which non-signatory to arbitration agreement may nonetheless be bound by agreement); *In re Rangel,* 45 S.W.3d at 787 (recognizing that non-signatory third-party beneficiary of arbitration contract may be required to arbitrate claims). Some individuals who

qualify as heirs might also fall within this type of privity: for example, children or a surviving spouse who assert claims as the estate's representative on the estate's behalf. However, under basic contract principles, parties to an arbitration agreement generally have no authority to bind by their contract anyone who does not have the requisite privity with at least one of them or with the contract itself to arbitrate anything. *Cf. Mohamed,* 89 S.W.3d at 835 (" 'A party cannot be required to arbitrate unless it has agreed to do so.' "); *Angroson, Inc. v. Indep. Communications, Inc.,* 711 S.W.2d 268, 271 (Tex.App.-Dallas 1986, writ ref'd n.r.e.) (holding, "[A] contract executed by an unauthorized agent, who makes the agreement on behalf of another, not in his individual capacity, is not enforceable" against the principal). A non-signatory wife, asserting in her individual capacity personal statutory claims for damages such as her own mental anguish and loss of consortium, earnings, companionship, society, and inheritance, lacks the type of privity contemplated for the contracting parties to bind her to a contract that she did not sign in her individual capacity. Simply put, a surviving wife may be an heir, within the meaning of an arbitration agreement that she did not sign individually, to her late husband's claims; she cannot be an heir to her own claims.

Third, we note that our wrongful-death statute (which grants a personal right to the spouse, children, and parents) does not use the term "heir" at all, while the survival statute (which establishes claims that are clearly derivative of the decedent's rights) provides that "[a] personal injury action survives to and in favor of the *heirs, legal representatives, and estate of the injured person." Compare* TEX. CIV. PRAC. & REM.CODE ANN. § 71.004(a)-(b) (Vernon 1997) (wrongful-death statute) *with id.* § 71.021(b) (Vernon 1997) (survival stat-

ute) (emphasis added). If anything, the arbitration agreement's use of the terms "heirs," "representatives," and "executor" within the quoted clause implies that the contracting parties were not considering those suing in their individual capacity for individual claims like wrongful death.

Finally, the other categories of non-signatories besides "heirs" who are listed in the quoted clause—successors, assigns, agents, attorneys, insurers, representatives, and trustees—fall into the category of those who either stand in Mr. Kepka's shoes or who have authority to act for him, on his behalf, or for his benefit. It is, therefore, reasonable to conclude that, when the contracting parties included "heirs" in this list, they meant only to the extent that those heirs were functioning in the same capacity as the others listed, *i.e.,* not when the heirs were suing on their own behalf for their own personal loss. *Cf. CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.,* 734 S.W.2d 653, 655 (Tex. 1987) (noting that "[t]he maxim *expressio unius est exclusio alterius,* meaning that the naming of one thing excludes another," though not conclusive, was applicable to construction of settlement agreement).

We sustain this portion of issue five.

### Conclusion

Given our disposition, we need not reach issue one, issue three, or the remainder of issue five.

We conditionally grant mandamus relief and order the trial court to deny Southfield's motion to compel arbitration in its entirety. The writ will issue only if the trial court fails to comply.