# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00313-CV

**Appellant, PM Management-Trinity NC, LLC d/b/a Trinity Care Center//
Cross-Appellants, Michael Kumets, Pavel Kumets, and Strul Kumets, Individually and as
next friend for Yevgeniya Kumets**

**v.**

**Appellees, Michael Kumets, Pavel Kumets, and Strul Kumets, Individually and as next
friend for Yevgeniya Kumets// Cross-Appellee, PM Management-Trinity NC, LLC d/b/a
Trinity Care Center**

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 368TH JUDICIAL DISTRICT
NO. 10-139-C368, HONORABLE BURT CARNES, JUDGE PRESIDING**

## O P I N I O N

In this accelerated interlocutory appeal, appellant PM Management-Trinity NC, LLC

d/b/a Trinity Care Center ("Trinity"), a defendant below, and cross-appellants Michael Kumets,

Pavel Kumets, and Strul Kumets, individually and as next friend for Yevgeniya Kumets (collectively

"the Kumetses"), plaintiffs below, challenge the trial court's orders granting in part and denying in

part the defendants' motions to dismiss the Kumetses' claims pursuant to section 74.351 of the

Texas Medical Liability Act (TMLA). *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b) (West

2011); *see also id.* § 51.014(a)(9) (West 2008) (permitting interlocutory appeal from trial court's

ruling under section 74.351). We will affirm the trial court's judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

This appeal arises from a suit between the Kumetses as plaintiffs and a group of health-care providers and physicians as defendants. Trinity is a nursing home where Yevgeniya Kumets was a resident from November 21, 2007 through January 20, 2009. Cross-appellee Trisun Healthcare, L.L.C. ("Trisun") provided nursing home management services to Trinity, and cross-appellee Brian Threadgill was employed as Trinity's licensed nursing-home administrator. The Kumetses alleged that Yevgeniya was admitted to Trinity to recover from a stroke. As pleaded by the Kumetses, Yevgeniya suffered a second debilitating stroke as a result of negligent treatment she received at Trinity. In their live pleading, the Kumetses asserted causes of action against Trinity for medical negligence, negligence per se, and gross negligence; negligent hiring, supervision, management, and retention; breach of fiduciary duty; breach of contract; violations of the Deceptive Trade Practices Act; and fraud/negligent misrepresentation. In a discrete section of their petition, the Kumetses also asserted against Trinity a claim for retaliation, alleging that Trinity illegally discharged Yevgeniya from the nursing home as a result of complaints made by the Kumetses. The Kumetses also alleged causes of action against Trisun and Threadgill for fraud/negligent misrepresentation and violations of the Deceptive Trade Practices Act, but not retaliation.

Pursuant to civil practice and remedies code section 74.351, the Kumetses served Trinity, Trisun, and Threadgill with an expert report addressing all but the retaliation claim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (expert report requirement in health care liability claims). The report did not mention Threadgill or Trisun. Trinity, Trisun, and Threadgill moved to dismiss the claims asserted against them on the ground that they were all health-care-liability claims and that

2

the Kumetses' expert report was deficient as to Trinity and was no report at all as to Trisun and Threadgill. The trial court found that the report was deficient and gave the Kumetses a 30-day extension to cure the deficiencies. *See id.* § 74.351(c) (permitting court to grant one 30-day extension to cure deficient report). After the Kumetses filed an amended report, Trinity, Trisun, and Threadgill each filed a second motion to dismiss. *See id.* § 74.351(b). After a second hearing, the trial court signed three orders: (1) an order stating that all the claims the Kumetses asserted against Trinity were health-care-liability claims except for the retaliation claim and, because the amended expert report was deficient as to all health-care-liability claims, dismissing all claims asserted against Trinity except for the retaliation claim; (2) a second order dismissing all claims asserted against Trisun; and (3) a third order dismissing all claims asserted against Threadgill. Trinity has appealed the trial court's order, arguing in three issues that the Kumetses' retaliation claim is a health-care-liability claim and that the trial court erred in denying its motion to dismiss that claim pursuant to section 74.351. The Kumetses filed a cross-appeal, contending in one issue that their claims against Trinity, Trisun, and Threadgill for fraudulent billing were not health-care-liability claims and that the trial court erred in granting the motions to dismiss those claims pursuant to section 74.351. The Kumetses do not complain in their cross-appeal about the trial court's ruling that the amended expert report was deficient as to their health-care-liability claims.

## DISCUSSION

We generally review a trial court's order granting or denying a motion to dismiss pursuant to section 74.351(b) under an abuse-of-discretion standard. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). However, when the issue presented involves the

3

applicability of chapter 74 to the plaintiff's claims and requires interpretation of the statute, we apply a de novo standard of review. *See Drewery v. Adventist Health Sys./Tex., Inc.*, 344 S.W.3d 498, 501-02 (Tex. App.—Austin 2011, pet. filed) (citing *Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 663 (Tex. 2010) (plurality op.)).

The Kumetses' live pleading included claims for medical negligence, negligence per se, and gross negligence; breach of fiduciary duty; breach of contract; negligent hiring, supervision, management, and retention; violations of the Deceptive Trade Practices Act; and fraud/negligent misrepresentation. Each of these causes of action arose out of the care and treatment Yevgeniya received while a patient at Trinity. For example, the allegations supporting the negligence claims included that Yevgeniya was (1) dropped during a transfer from the bathtub; (2) infected while being administered intravenous antibiotics, resulting in infections and rashes; (3) left unsupervised and allowed to incur substantial bruising; and (4) not properly hydrated. The Kumetses asserted that Yevgeniya suffered a stroke as the result of poor dietary routines and unmonitored medication levels. They alleged that the adverse results of the stroke were exacerbated by her being left unattended and that, as a consequence, she is unable to speak, eat, or bathe without assistance. The Kumetses alleged that these and other described negligent acts caused personal and emotional injury, physical impairment, pecuniary loss, pain and suffering, mental anguish, and loss of quality of life. In their breach-of-fiduciary-duty claim, the Kumetses alleged that Trinity, as Yevgeniya's "health services provider," owed her a duty to treat her in a manner that encouraged and fostered her best interests and well-being but instead failed to adequately care for her. The Kumetses' breach-of-contract claim asserted that Trinity failed to provide the services and qualified staff required by the contract

4

between the parties and were negligent in performing their duties under the contract. The allegations supporting the fraud/negligent-misrepresentation claim included that Trinity, Trisun, and Threadgill: (1) misrepresented the services Trinity provides, including making incorrect statements about the quality, quantity, and ratio of licensed nurses and professionally trained personnel; and (2) submitted fraudulent claims for Medicaid reimbursement for services they did not provide. The Kumetses alleged that "physical and mental injuries and anguish and associated economic damages" resulted from the fraud and negligent misrepresentations. The negligent-hiring and supervision claim alleged that Trinity failed to properly supervise and train personnel or to implement adequate safeguards to prevent the situations that resulted in Yevgeniya's injuries and that Trinity failed to terminate employees when "it knew or reasonably should have known the employees acted in ways that compromised the rights and safety of others." Finally, the cause of action for DTPA violations alleged that Trinity, Trisun, and Threadgill made misrepresentations regarding the quality, quantity, and ratio of licensed nurses and professionally trained personnel, failed to provide required care that "resulted in the deterioration of [Yevgeniya]," and billed the Kumetses and made claims for Medicaid reimbursement for services they did not provide. The Kumetses alleged that the DTPA violations caused them to suffer damages including mental anguish.

By contrast, the allegations supporting the Kumetses' retaliation claim did not implicate the care or treatment Yevgeniya received while a resident at Trinity. Rather, the Kumetses alleged simply that Trinity retaliated against Yevgeniya for complaints they made regarding her care, in violation of the health and safety code. They alleged that the retaliatory conduct was Yevgeniya's discharge from the facility. The Kumetses did not allege that the discharge caused her any physical,

5

mental, or emotional injuries. Instead, they sought to recover only the statutory damages authorized by the health and safety code for retaliation. *See* Tex. Health & Safety Code Ann. § 242.1335(b) (West 2010) (damages for retaliation include greater of $1,000 or actual damages; exemplary damages; court costs; and reasonable attorneys' fees).[1]

### *Denial of Trinity's Motion to Dismiss the Retaliation Claim*

In its appeal, Trinity contends that the trial court erred by denying its motion to dismiss the Kumetses' retaliation claim. We first consider whether the Kumetses' retaliation claim is a health-care-liability claim subject to section 74.351's report requirement. Section 74.351 applies only to "health care liability claims." *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). The TMLA defines a "health care liability claim" as

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

*Id.* § 74.001(a)(13) (West Supp. 2011). Whether a claim falls within this definition requires an examination of the gravamen of the plaintiff's claim, not the form of the pleadings. *Marks*, 319 S.W.3d at 665 (citing *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 847 (Tex. 2005)). The Texas Supreme Court has instructed that the definition consists of three component

---

[1] Health and safety code section 242.1335 was repealed by Act of June 28, 2011, 82d Leg., 1st C.S., ch.7, § 1.05(m), 2011 Tex. Gen. Laws 5390, 5407. However, the statute is applicable to a cause of action that accrued before September 28, 2011, and section 242.1335 is continued in effect for that purpose. *See id.* § 1.05(p), 2011 Tex. Gen. Laws 5390, 5407.

6

parts: (1) a physician or health-care provider must be named as the defendant; (2) the cause of action must refer to a patient's treatment, lack of treatment, or some other departure from accepted and specialized standards of care; and (3) the defendant's act, omission, or other departure must proximately cause the patient's injury or death. *See id.* at 662. The parties do not dispute that Trinity, Trisun, and Threadgill qualify as health-care providers, but they do dispute whether the remaining two components of the definition are met. Because it is dispositive, we focus on the third component, i.e., whether the act complained of in the Kumetses' retaliation claim "proximately cause[d] the patient's injury or death."

The Kumetses' claim of retaliation contains the following allegations:

> A resident in a nursing home participating in the Medicaid program may be transferred or discharged only under limited circumstances, such as where transfer is needed for his or her own welfare or for the safety of others and, except in limited cases such as the need for urgent medical treatment. Here, *Ms. Kumets was discharged by [Trinity] . . . for reasons other than those prescribed by law (i.e. retaliation for complaints by family members) and in a manner and timeframe in violation of the Texas Health & Safety Code.* A nursing home may not retaliate or discriminate against a resident for [the] making of a complaint or the filing of a grievance or report in accordance with Chapter 242 of the Health and Safety Code. As indicated in an order from Texas Health and Human Services Commission hearings Office[r] Kara Willoughby dated August 3, 2009, Defendants violated the Texas Administrative Code in [d]ischarging Ms. Kumets. Plaintiffs therefore, [sic] sue Defendant [Trinity] for actual damages, exemplary damages, court costs, and attorney's fees pursuant to Texas Health and Safety Code Section 242.1335(b)(5).

(Emphasis added.) Nowhere do the Kumetses allege that the act complained of, i.e., the alleged retaliatory discharge of Yevgeniya from the nursing home, caused her any bodily harm or personal injury, nor do they allege that her condition worsened as the result of being discharged. They do not claim that she or they suffered any mental anguish or emotional distress resulting from the discharge.

7

Their pleadings seek to recover "actual damages," which they contend consist only of their economic losses caused by the discharge.[2] The Kumetses also seek to recover exemplary damages, which the statute expressly permits without requiring a showing of mental anguish, emotional distress, or any other bodily harm or injury. *See* Tex. Health & Safety Code Ann. § 242.1335(b)(3) (resident or family member who is retaliated against in violation of statute is entitled to sue for exemplary damages).

In light of the facts alleged in the Kumetses' retaliation claim, the trial court could reasonably have ruled that the only adverse consequence—i.e., the only "injury"—arising from the discharge was economic loss to the Kumetses and/or Yevgeniya. We must decide, then, whether the third component of a health-care-liability claim is met when the claimant alleges that the breach of the relevant standard of care resulted solely in economic or pecuniary harm.

We recognize that when a plaintiff alleges that a health care provider breached an applicable standard of health care and also alleges that the breach proximately caused both injury to or the death of a claimant *and* economic harm, the claim may be a health-care-liability claim even if the plaintiff opts to forego recovering damages for the bodily or personal injury and instead seeks to recover only for the economic losses resulting from the breach. *See Victoria Gardens v. Walrath*, 257 S.W.3d 284, 288 (Tex. App.—Dallas 2007, pet. denied). The definition of "health care liability claim" itself contains no limitations based on the nature of the damages being sought. *Id.* It does, however, require that the claimant have suffered injury or death. The question presented is whether

---

[2] The Kumetses state in their brief to this Court that they "are seeking compensation by and through Ms. Yevgeniya Kumets for damages *unrelated* to physical injury or death, but rather economic damages relating to the *retaliation* claim." (Emphasis in original.)

the phrase "injury to or death of the claimant," as used in the TMLA, includes pure economic loss, with no accompanying bodily injury or other personal injury. We conclude that it does not.

Our primary objective in statutory construction is to give effect to the legislature's intent. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). "Where the text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (op. on reh'g) (citing *Shumake*, 199 S.W.3d at 284; *Alex Sheshunoff Mgmt. Servs. v. Johnson*, 209 S.W.3d 644, 651-52 (Tex. 2006)). We consider the words in context, not in isolation. *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from the context, or unless such a construction leads to absurd results. *See Entergy Gulf States, Inc.*, 282 S.W.3d at 437. When the statutory text is ambiguous, we may "'resort to' rules of construction or extrinsic aids." *Id.* (quoting *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex. 2007)).

In the present case, we must determine whether the term "injury" in chapter 74's definition of a "health care liability claim" includes claims in which the only resulting harm is pecuniary. The term is not otherwise defined in chapter 74 and therefore must be assigned "such meaning as is consistent with the common law." *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(b). Black's Law Dictionary defines the term as "the violation of another's legal right, for which the law provides a remedy." Black's Law Dictionary 856 (9th ed. 2009). Webster's defines "injury" as "an act that damages, harms or hurts: an unjust or undeserved infliction of suffering or harm." Webster's Third New Int'l Dictionary 1164 (2002). Viewed in isolation, the term "injury"

9

could, under these definitions, encompass a wide variety of harm or damage done to another, either in his person, rights, reputation, or property. But in the context of a medical-negligence claim, and particularly the language of section 74.351(a) of the TMLA ("injury to or death of a claimant"), the term "injury" would seem to carry with it the implication that the alleged deviation from an accepted standard of care must cause the plaintiff to suffer some personal injury, whether physical, mental, or emotional. In short, the legislature's intent is not clear from the statutory language. Accordingly, we are guided by the following aids to statutory construction:

> In construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the: (1) object sought to be attained; (2) circumstances under which the statute was enacted; (3) legislative history; (4) common law or former statutory provisions, including laws on the same or similar subjects; (5) consequences of a particular construction; (6) administrative construction of the statute; and (7) title (caption), preamble, and emergency provision.

Tex. Gov't Code Ann. § 311.023 (West 2005); *see also id.* § 312.005 (West 2005) ("In interpreting a statute, a court shall diligently attempt to ascertain legislative intent and shall consider at all times the old law, the evil, and the remedy.").[3]

---

[3] As the supreme court observed in *Wortham v. Walker*, 128 S.W.2d 1138, 1150 (Tex. 1939):

A statute should not be construed in a spirit of detachment as if it were a protoplasm floating around in space. The historical treatment to which a statute may be subjected is aptly set forth in *Travelers' Insurance Co. v. Marshall*, 76 S.W.2d 1007, 1012 (Tex. 1939), where it is said: "Generally it may be said that in determining the meaning, intent, and purpose of a law or constitutional provision, the history of the times out of which it grew, and to which it may be rationally supposed to bear some direct relationship, the evils intended to be remedied, and the good to be accomplished, are proper subjects of inquiry."

The TMLA's predecessor statute, the Texas Medical Liability and Insurance Improvement Act ("TMLIIA"), was enacted in 1977. *See* Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen Laws 2039, formerly Tex. Rev. Civ. Stat. Ann. art. 4590i. The legislature's stated purpose in enacting the TMLIIA was to remedy "a medical malpractice insurance crisis" in Texas and its "material adverse effect on the delivery of medical and health care services in Texas, including significant reductions of availability of medical and health care services to the people of Texas and a likelihood of further reductions in the future." *Id.* § 1.02(a)(5)-(6). In 2003 the legislature replaced the TMLIIA with the TMLA, repeating its 1977 findings and statements of purpose. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 10.01, 10.09, 10.11, 2003 Tex. Gen. Laws 847, 864-82, 884-85.

Consistent with the statute's purpose of reducing the cost of medical-malpractice insurance, the legislature placed limits on physicians' and health-care providers' liability, but only as to *noneconomic* damages. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.301 (limitation on noneconomic damages). The "object sought to be obtained" by chapter 74 was to rein in what was perceived to be excessive awards for noneconomic damages that were driving up the cost of medical malpractice insurance, which in turn reduced the number of health-care providers willing to provide services in Texas and the availability of medical and health-care services to the people of Texas. *See Aviles v. Aguirre*, 292 S.W.3d 648, 649 (Tex. 2009) (per curiam) (noting that virtually all legislative findings expressed in statute relate to cost of malpractice insurance). Given the object of the statute and the legislature's express concern, it is apparent that, in adopting chapter 74, the legislature was not concerned with claims in which the sole "injury" to the claimant was pecuniary. *See id.*

11

§ 1.02(b)(3) (reciting legislature's intent that statute operate to control medical malpractice insurance costs without unduly restricting a patient's rights).

We believe that interpreting the TMLA to require an injury that involves more than mere out-of-pocket economic harm accurately reflects the "old law, the evil, and the remedy" and more closely serves the legislature's purpose in enacting chapter 74. Thus, in our view, for a cause of action to be a health-care-liability claim within the purview of the TMLA, the "injury" that proximately results from the alleged wrongful conduct must involve more that simply economic harm. Rather, it must also involve some type of personal injury, including that which would entitle the plaintiff to seek to recover noneconomic damages. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 41.001 (West 2008) (defining noneconomic damages as damages awarded for purpose of compensating claimant for physical pain and suffering, mental or emotional pain or anguish, loss of consortium, disfigurement, physical impairment, loss of companionship or society, inconvenience, loss of enjoyment of life, injury to reputation, and all other nonpecuniary losses of any kind other than exemplary damages); 74.001(a)(20) (term "noneconomic damages" for purposes of chapter 74 has meaning assigned by section 41.001).

The context in which the term appears in the statute also supports the notion that the term "injury" in the TMLA does not refer to economic harm alone but rather connotes a personal injury suffered by a recipient of medical or health-care services. Chapter 74 was designed to eliminate frivolous medical-negligence claims deemed responsible for increasing medical-malpractice insurance premiums to unacceptable levels, and this provision defines the class of claims falling within the scope of the legislation. The definition includes deviations from

accepted standards of care that result in "injury to or death of" the claimant. When read in context, the term "injury" logically means more than pecuniary harm alone.

This interpretation also comports with our obligation to consider the consequences of a particular construction and construe the statute in a manner that does not lead to absurd results. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008). Chapter 74's definition of "claimant" states that "[a]ll persons claiming to have sustained damages as the result of the *bodily injury* or death of a single person are considered a single claimant." Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(2) (emphasis added). Thus, the definition of "claimant" uses the phrase "bodily injury," whereas the definition of "health care liability claim" uses the word "injury." The phrase "bodily injury" clearly excludes pure economic harm. If the definition of a "health care liability claim" were held to include claims in which only economic harm was suffered, two different procedures would exist for derivative claimants. Multiple parties who alleged only economic harm would not, under section 74.001(a)(2), be considered "a single claimant," and each would have to file his or her own expert report. By contrast, multiple parties who alleged more than mere economic harm would be treated as "a single claimant" under the statute. We can think of no principled or logical reason for treating such claimants differently.

Further support for our conclusion that a "health care liability claim" must entail more than pure economic loss is found in section 74.451, a provision governing agreements to arbitrate health-care-liability claims. That section provides:

> No physician, professional association of physicians, or other health care provider shall request or require a patient or prospective patient to execute an agreement to arbitrate a health care liability claim unless the form of agreement delivered to the

13

patient contains a written notice in 10-point boldface type clearly and conspicuously stating:

UNDER TEXAS LAW, THIS AGREEMENT IS INVALID AND OF NO LEGAL EFFECT UNLESS IT IS ALSO SIGNED BY AN ATTORNEY OF YOUR OWN CHOOSING. THIS AGREEMENT CONTAINS A WAIVER OF IMPORTANT LEGAL RIGHTS, INCLUDING YOUR RIGHT TO A JURY. YOU SHOULD NOT SIGN THIS AGREEMENT WITHOUT FIRST CONSULTING WITH AN ATTORNEY.

*Id*. § 74.451 (West 2011). By enacting this provision, the legislature ensured that individuals bringing "health care liability claims" could not agree to arbitration and thereby waive their right to a jury trial unless they had first conferred with counsel. A similar requirement exists in the non-health care liability context, but only with respect to *personal injury* claims. *See id.* § 171.001, .002(a)(3), .002(c)(1) (West 2011). Chapter 171 provides that a written agreement to arbitrate is valid and enforceable if an arbitration agreement exists and the claim asserted is within the scope of the agreement *unless it is a personal injury claim*, in which case each party must, on the advice of counsel, agree in writing to arbitration. *Id.* Such an agreement must not only be in writing, it must also be signed by each party and each party's attorney. *Id.* § 170.002(c)(2). The fact that the legislature has imposed similar arbitration safeguards with respect to a "health care liability claim" suggests that the legislature views "health care liability claims"—claims subject to the "advice-of-counsel" protections—as akin to personal injury claims involving more than pure economic harm. Otherwise, it would be unlikely that the legislature would insist on the safeguards of attorney review and consultation that it deemed unnecessary in the context of non-health-care-liability claims not involving personal injury.

14

Finally, our interpretation is consistent with a holding of the Dallas Court of Appeals in *Victoria Gardens*. *See* 257 S.W.3d at 288-89. The issue in *Victoria Gardens* was the timeliness of service of an expert report. The plaintiff, Ann Walrath, served the report only after filing her third amended petition, in which she alleged what she agreed was a health-care-liability claim—an assertion that the complained-of conduct caused personal injury to, and ultimately the death of, her mother Gladys Weidel. Victoria Gardens contended that the report was untimely because, in its view, an earlier-filed second amended petition already contained a health-care-liability claim that triggered the chapter 74 report requirement. The Dallas court framed the issue as follows:

> The remaining question is whether Walrath avoided triggering Chapter 74 with her second amended petition by expressly stating that "she does not now make any allegation that the breach of the parties' contract proximately resulted in injury to or the death of Gladys Weidel." Elsewhere in the petition, Walrath alleged that Victoria Gardens' breaches of contract were "a direct and proximate cause of damages," but she immediately qualified that allegation by adding, *"which damages Plaintiff alleges are equal to the amount Defendant charged and which amounts were paid on behalf of Weidel for each day she was a resident at Defendant's facility." Thus, on its face, Walrath's second amended petition did not affirmatively state the third element of a health care liability claim, that Victoria Gardens' breaches of applicable standards of care "proximately result[ed] in injury to or death of a claimant."*

*Id.* (emphasis added). The court ultimately concluded that the expert-report requirement was triggered by Walrath's *third* amended petition, which contained an allegation "that Victoria Gardens' negligence proximately caused injuries to Weidel and ultimately her death." *Id.* at 286. The court held that Victoria Gardens "was entitled to use Walrath's assertions in later filings *to supply the allegation of proximate causation of injury or death*" that it concluded she had artfully omitted from her second amended petition. *Id.* at 289 (emphasis added). The court held that, standing alone,

15

Walrath's second amended petition alleging only economic loss did not state the third element of a health-care-liability claim, but that the "previously missing allegation" was supplied by Walrath's later filings. *Id*.

In the present case, the trial court could reasonably have concluded that the Kumetses' retaliation claim alleged only economic loss, not "injury to or death of" Yevgeniya, and thus did not include allegations sufficient to meet the third element of a health-care-liability claim. Unlike *Victoria Gardens*, here there are no later filings to supply the missing allegation of personal injury. We conclude that the trial court did not err or abuse its discretion in concluding that the retaliation claim was not a health-care-liability claim and therefore denying Trinity's motion to dismiss. We overrule Trinity's three appellate issues.

### Did the Trial Court Err in Dismissing the Kumetses' "Billing Claims"?

In their cross-appeal, the Kumetses contend in one issue that the trial court abused its discretion by dismissing what they characterize as their claims for "improper medical billing, whether under fraud or negligence theory." Unlike the retaliation claim, the allegations of improper medical billing were subsumed within the causes of action for fraud and negligent misrepresentation and for DTPA violations that arose out of and related to events that occurred during Yevgeniya's residency at the nursing home. The live pleading did not include a separate cause of action for fraudulent billing for any conduct unrelated to Yevgeniya's care. And, in contrast to their retaliation claim, the Kumetses alleged mental and emotional injury, not pure economic harm, resulting from the allegedly fraudulent conduct.

16

Under the second element of a health-care-liability claim, we examine the allegations that form the "cause of action," a term not expressly defined under the TMLA. The supreme court has observed that a "cause of action" may be regarded "as a fact or facts entitling one to institute and maintain an action, which must be alleged and proved in order to obtain relief," or a "group of operative facts giving rise to one or more bases for suing." *In re Jorden*, 249 S.W.3d 416, 421 (Tex. 2008) (orig. proceeding) (quoting *A.H. Belo Corp. v. Blanton*, 129 S.W.2d 619, 621 (Tex. 1939), and Black's Law Dictionary 235 (8th ed. 2004)). Informed by this understanding, when determining whether a cause of action constitutes a health-care-liability claim, we look to the facts upon which relief is sought, rather than the manner in which the cause of action is pleaded. *See Yamada v. Friend*, 335 S.W.3d 192, 196-97 (Tex. 2010). When the essence of the suit is a health-care-liability claim, a party cannot avoid the requirements of the statute through artful pleading. *Id.* If the facts complain of an act or omission that is an "inseparable part of the rendition of medical services," then the cause of action is a health-care-liability claim. *Diversicare Gen. Partner, Inc.*, 185 S.W.3d at 848. In determining whether a claim is inseparable from the rendition of medical services, we may consider such factors as (1) whether a specialized standard of care in the health-care community applies to the circumstances in question; (2) whether the alleged facts or omissions involve medical judgment related to the patient's care or treatment; and (3) whether medical-expert testimony would be needed to prove the cause of action. *Id.* at 851-52; *Drewery*, 344 S.W.3d at 502.

A review of the allegations that include the Kumetses' assertion of fraudulent billing reveals that they include numerous complaints regarding the quality, quantity, and ratio of licensed nurses and trained personnel who provided care to Yevgeniya. For example, the Kumetses alleged:

- defendants made misrepresentations including statements regarding the quality, quantity, and ratio of licensed nurses and professionally trained personnel in the facility and advised them that trained personnel would be providing services to Yevgeniya;

- as a result of the misrepresentations, Yevgeniya suffered injuries such as being dropped during a transfer;

- defendants continued to represent to the Kumetses that they were providing services that they were not providing and that the Kumetses relied to their detriment on the false statements regarding services provided and quality and quantity of licensed and professionally trained personnel;

- defendants submitted claims to the government for Medicaid reimbursement of services to Yevgeniya that did not take place and that such mistakes in the treatment of and billing were negligent and constituted negligent misrepresentations.

The essence of the Kumetses' claims center around whether Yevgeniya received the appropriate restorative therapy and nursing home services—clearly health-care-liability claims. The same facts that the Kumetses rely on to support their allegations of negligence, fraud, and negligent misrepresentation are the basis for the allegation of billing fraud. For example, the Kumetses allege:

By the actions and omissions complained of herein,[4] [Trinity], Trisun and Threadgill willfully failed to provide required care that resulted in the deterioration of Ms.

---

[4] Including, for example, failing to prevent the deterioration of the resident's ability to bathe, dress, and ambulate; failing to insure that the resident maintains acceptable parameters of nutritional status; and failing to provide pharmaceutical services.

18

> Kumets and are suspected to have billed Plaintiffs and were reimbursed by Medicaid, for services NOT provided, thereby submitting false claims to the government for services not provided.

Although the Kumetses asserted that the billing was fraudulent, the trial court could reasonably have concluded that it was alleged to be fraudulent both with regard to whether the services Yevgeniya received while in the facility were carried out in an appropriate manner by qualified personnel, as represented they would be, as well as whether all the billed services were in fact provided.[5] A claim based on the same facts that are asserted in support of a health-care-liability claim cannot be separated from the health-care-liability claim. *See Yamada*, 335 S.W.3d at 192-94 ("When the underlying facts are encompassed by provisions of the TMLA in regard to a defendant, then all claims against that defendant based on those facts must be brought as health care liability claims."). We conclude that the trial court did not err or abuse its discretion in determining that the allegations of billing fraud intermingled within, and relying on the same facts as, other causes of action that both parties concede are health-care-liability claims, were subject to the requirements of chapter 74.[6] Consequently, we overrule the Kumetses' cross-appeal issue.

---

[5] The expert report provided by the Kumetses, as it pertains to the fraudulent billing claim, observes both that services charged by physicians for medical care between the dates of November 6, 2007 and April 6, 2008 were denied based on questions regarding the number of claimed physician visits and that "a significant amount of the onsite care at Trinity Health Care was provided by a nurse practitioner."

[6] We do not hold that a fraudulent-billing claim is always a health-care-liability claim. While a fraudulent-billing claim alleging only that services for which the patient was billed were not provided may well not be a health-care-liability claim subject to the chapter 74 requirements, we need not address that question.

19

## CONCLUSION

Because the Kumetses did not allege in their retaliation claim that they or Yevgeniya suffered any harm other than pure economic injury as a result of the alleged retaliation, and because the facts underlying their retaliation claim are wholly distinct from the facts underlying their health-care-liability claims, we conclude that that claim does not satisfy the third element of a health-care-liability claim—"injury to or death of the claimant" proximately resulting from the allegedly wrongful conduct. Accordingly, the trial court did not err or abuse its discretion in denying Trinity's motion to dismiss that claim. We also conclude that the trial court did not err or abuse its discretion in granting Trinity's, Trisun's, and Threadgill's motions to dismiss the Kumetses' claims related to alleged fraudulent billing. We therefore affirm the trial court's judgment.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Henson
   Concurring and Dissenting Opinion by Justice Pemberton

Affirmed

Filed: April 20, 2012

20