

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-13-00110-CV

**THE WILLIAMSBURG CARE COMPANY L.P.**,
d/b/a Princeton Place Rehabilitation and Healthcare,
Appellant

v.

Jesusa **ACOSTA**, Individually and as Representative of the Estate of Maria Acosta, Deceased,
And Magdalena Acosta, Alicia Garcia, Jeffie Acosta, Horacio Acosta, Maria Guadalupe
Baldazo, Edward Acosta, Antonio Acosta, Jr., and Adelita Acosta Gonzalez, All Individually;
Mary Jane Esparza, Individually;
Melissa Rodriguez, Antonio Rodriguez, and Raymond Rodriguez, Individually and as All Heirs
of Mary Esther Rodriguez, Deceased;
Cecilia Romo, Individually;
Juan Saucedo, Individually; and
Diana G. Tayles, Individually,[1]
Appellees

From the 73rd Judicial District Court, Bexar County, Texas
Trial Court No. 2012-CI-16420
Honorable Richard Price, Judge Presiding

Opinion by:    Rebeca C. Martinez, Justice

Sitting:       Catherine Stone, Chief Justice
               Karen Angelini, Justice
               Rebeca C. Martinez, Justice

Delivered and Filed:  June 26, 2013

AFFIRMED

---

[1] A suggestion of death has been filed by Anna Ramirez as the Representative of the Estate of Diana G. Tayles.

Appellant The Williamsburg Care Company, L.P. d/b/a Princeton Place Rehabilitation and Healthcare Medical Center, owner of a nursing and long-term care facility in San Antonio (the "Nursing Facility"), appeals the trial court's denial of its motion to compel arbitration under the Federal Arbitration Act (FAA) in the underlying health care liability lawsuit. The sole issue in this interlocutory appeal is whether Texas Civil Practice and Remedies Code section 74.451, the arbitration provision of the Texas Medical Liability Act, is a law "enacted for the purpose of regulating the business of insurance" within the meaning of the federal McCarran-Ferguson Act (MFA) and is thus protected from FAA preemption. TEX. CIV. PRAC. & REM. CODE ANN. § 74.451 (West 2011). We conclude that it is, and therefore affirm the trial court's order denying arbitration under the FAA.

### FACTUAL AND PROCEDURAL BACKGROUND

Several former residents of Princeton Place Rehabilitation and Healthcare, either individually or through their heirs and representatives of their estates (collectively, the "Former Residents"),[2] sued the Nursing Facility for negligence and gross negligence alleging they were denied appropriate medical and nursing care and suffered abuse and neglect. The Nursing Facility filed a motion to compel arbitration under the FAA based on the written admission agreements signed by, or on behalf of, the Former Residents. Each admission agreement contained an arbitration clause stating, "Any legal dispute, controversy, demand or claim . . . that arises out of or relates to the Resident Admission Agreement or any service or health care provided by the Facility to the Resident, shall be resolved exclusively by binding arbitration . . . and not by lawsuit or resort to court process . . . ." The clauses did not contain the 10-point boldface type notice required by section 74.451, and did not contain the signature of an attorney for the patient. In

---

[2] The Former Residents are Maria Acosta (Deceased), Mary Jane Esparza, Mary Esther Rodriguez (Deceased), Cecilia Romo, Juan Saucedo, and Diana G. Tayles (Suggestion of Death Filed).

addition, some of the Former Residents also signed a "Mutual Agreement to Arbitrate Claims" which similarly did not include the required boldface notice or attorney signature.

The Former Residents filed a response asserting that the FAA did not apply because section 74.451 is a law regulating the business of insurance, and the MFA protects it from preemption by the FAA; therefore, section 74.451 controls the enforceability of the arbitration agreements, which do not comply with the law's requirements. Section 74.451 provides that an arbitration agreement between a health care provider and a patient is not enforceable unless it has a 10-point type boldfaced notice and is signed by the patient's attorney. TEX. CIV. PRAC. & REM. CODE ANN. § 74.451. There is no dispute that the arbitration agreements did not comply with section 74.451's requirements.

After a hearing on January 30, 2013, the trial court took the matter under advisement and later issued its ruling denying the Nursing Facility's motion to compel arbitration under the FAA. The Nursing Facility brought this interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.016 (West Supp. 2012) (authorizing an appeal from an interlocutory order in a matter subject to the FAA). Oral argument was held in this appeal jointly with related Appeal Nos. 04-13-00111-CV, styled *Fredericksburg Care Co., L.P. d/b/a Princeton Place Rehabilitation and Healthcare Med. Ctr. v. Perez, et al.*, and 04-13-00112-CV, styled *Fredericksburg Care Co., L.P. d/b/a Princeton Place Rehabilitation and Healthcare Med. Ctr. v. Lira*. Separate opinions and judgments are being issued in each of the three related appeals, but the legal analysis is identical.

## DISCUSSION

### Standard of Review

Whether a valid arbitration agreement exists is a legal question subject to de novo review. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003). The party seeking to compel arbitration has the initial burden to establish the existence of a valid arbitration agreement and that

the claims fall within the agreement's scope. *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 605, 607 (Tex. 2005) (orig. proceeding). The strong presumption favoring arbitration arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists. *Webster*, 128 S.W.3d at 227. Under the FAA, an agreement to arbitrate is valid if it meets the requirements of general contract law of the applicable state. *In re AdvancePCS*, 172 S.W.3d at 606 (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Once it is established that a valid arbitration agreement exists covering the claims, a presumption attaches favoring arbitration and the burden shifts to the party resisting arbitration to establish a defense to enforcing arbitration. *In re AdvancePCS*, 172 S.W.3d at 607; *J.B. Hunt Transport, Inc. v. Hartman*, 307 S.W.3d 804, 810 (Tex. App.—San Antonio 2010, orig. proceeding).

### *Federal Arbitration Act (FAA) – Preemption of Conflicting State Law*

The Federal Arbitration Act (FAA), 9 U.S.C. §§ 1, et seq., "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008) (citing *Southland Corp. v. Keating*, 465 U.S. 1, 10-12 (1984)). The FAA rests on Congress's authority under the Commerce Clause and applies in state courts as well as federal courts. *Id.* at 349, 353. Section 2 of the FAA states, "A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see In re Halliburton Co.*, 80 S.W.3d 566, 568 (Tex. 2002) (orig. proceeding) (under FAA, an arbitration agreement that is valid under state contract law and involves interstate commerce is "valid, irrevocable, and enforceable"). The national policy in favor of arbitration codified in the FAA "foreclose[s] state legislative attempts to undercut the enforceability of arbitration agreements." *Preston*, 552 U.S. at 353; *Southland*, 465 U.S. at 16. Thus, the FAA preempts state

law restrictions on arbitration that are inconsistent with the FAA. *Preston*, 552 U.S. at 353 (noting that the "FAA's displacement of conflicting state law is 'now well-established'" and "has been repeatedly reaffirmed"); *see, e.g., Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 684-85, 687 (1996) (holding that FAA preempted Montana statute [non-insurance related] which conditioned enforceability of contractual arbitration clause on compliance with special requirement that notice stating the "contract is subject to arbitration" be printed on first page of contract in underlined capital letters).

The Texas Supreme Court has held that an attorney-signature restriction on arbitration contained in the general Texas Arbitration Act (TAA) is inconsistent with the FAA. In *In re Nexion Health at Humble, Inc.*, 173 S.W.3d 67 (Tex. 2005) (orig. proceeding), the Supreme Court considered whether an attorney-signature requirement imposed by the TAA conflicted with the FAA, and was thus preempted by the FAA. The Court focused on the following four factors: (1) whether the arbitration agreement was in writing; (2) whether it involved interstate commerce; (3) whether it could withstand scrutiny under traditional contract defenses; and (4) whether state law affected the enforceability of the agreement. *Id.* at 69. With respect to the second factor, the Court held that transmission of Medicare funds across state lines constitutes interstate commerce which brings a health care provider-patient contract within the FAA's scope. *Id.* Having found the first three factors, the Court held that the fourth factor was also met because the TAA provision "interferes with the enforceability of the arbitration agreement by adding an additional requirement—the signature of a party's counsel—to arbitration agreements in personal injury cases;" therefore, the TAA was preempted by the FAA and the attorney-signature requirement did not apply. *Id.* For FAA preemption to apply, the state law must refuse to enforce an arbitration agreement that the FAA would enforce. *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 780 (Tex. 2006) (orig. proceeding) ("For the FAA to preempt the TAA, state law must refuse to enforce an

arbitration agreement that the FAA would enforce, either because (1) the TAA has expressly exempted the agreement from coverage, . . . or (2) the TAA has imposed an enforceability requirement not found in the FAA . . . ."); *see also In re AdvancePCS*, 172 S.W.3d at 606 n.5 (FAA preempts state contractual requirements that apply only to arbitration clauses, citing *Casarotto*, 517 U.S. at 686-87). *In re Nexion* did not address the potential impact of the MFA on the preemption analysis.

### *McCarran-Ferguson Act (MFA) – Exception for State Law Regulating Insurance*

The McCarran-Ferguson Act (MFA) provides an exception to FAA preemption if the conflicting state law was enacted "for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b) (stating in relevant part that, "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance."). The MFA prevents a federal statute from preempting a conflicting state statute if (1) the federal statute does not specifically relate to "the business of insurance," (2) the state law was "enacted for the purpose of regulating the business of insurance," and (3) the federal statute operates to "invalidate, impair, or supersede" the state law. *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 500-01 (1993); *Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 590 (5th Cir. 1998). Thus, under the MFA, state laws enacted for the purpose of regulating insurance prevail over general federal laws that do not specifically relate to the business of insurance. In the instant appeal, we are concerned only with the second prong of the MFA.

The United States Supreme Court has interpreted the meaning and scope of the MFA's second prong, whether a state law was "enacted for the purpose of regulating the business of insurance," in a limited number of cases. *SEC v. Nat'l Securities, Inc.*, 393 U.S. 453 (1969), dealt with two Arizona insurance companies that had merged with approval of the Arizona Director of

Insurance as required by state law; the SEC sued to rescind the merger for alleged material misrepresentations. In holding that the MFA did not protect a state statute regulating the relationship between stockholder and insurance company from preemption by the federal securities laws, the Supreme Court stated that the "core of the 'business of insurance'" under the MFA is "[t]he relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement." *Id.* at 460. Without elaborating, the Court also recognized that "[u]ndoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class." *Id.* Finally, the Court stated that, "whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder." *Id.*

*Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119 (1982), involved whether a health insurer's practice of using a peer review committee to evaluate the reasonableness of chiropractic claims, alleged to be a price-fixing conspiracy, was part of "the business of insurance" and thus exempted from the federal antitrust law by the MFA. In *Pireno*, the Supreme Court discussed three criteria relevant in determining whether a particular practice by an insurance company is part of the "business of insurance," which include whether: (1) the practice has the effect of transferring or spreading a policyholder's risk; (2) the practice is an integral part of the policy relationship between the insurer and the insured; and (3) the practice is limited to entities within the insurance industry." *Id.* at 129 (citing *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211-12 (1979)). None of these criteria is itself dispositive. *Pireno*, 458 U.S. at 129. The Court held the insurance company's practice of using the peer review committee did not meet any of the three criteria, and did not constitute the "business of insurance." *Id.* at 130-34. With respect to the second factor, whether the practice is integral to the insurer/insured relationship, the Court explained that even though the challenged practice may constitute sound business practice and

may result in cost savings to the insurer, which may be passed on to the insured in the form of lower premiums, that does not mean it constitutes the "business of insurance." *Id.* at 132 (citing *Royal Drug*, 440 U.S. at 214-16, and noting that the MFA exempts the "business of insurance," not the "business of insurance companies").

The parties agree that the seminal case for purposes of the instant appeal is *United States Dept. of Treasury v. Fabe*, 508 U.S. 491 (1993). *Fabe* addressed whether a state statute governing insurance company liquidations, which conflicted with federal bankruptcy law, was protected from preemption by the first clause of section 1012(b) of the MFA. In *Fabe*, the Supreme Court dealt with an Ohio statute that gave policyholders and other creditors preference over the federal government in insurer liquidations; the statute was part of an overall regulatory scheme that governed insurers from inception to dissolution, i.e., it directly regulated insurers. *Id.* at 494. The Court began its analysis by recognizing that the MFA was enacted in response to a 1944 Supreme Court case holding that the federal antitrust law, the Sherman Act, applied to the business of insurance when conducted across state lines. *Id.* at 499 (discussing *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944)). The Court noted that the stated mission of the MFA is "very clear: . . . that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier . . . ." *Id.* at 500 (quoting 15 U.S.C. § 1011).

To determine the legislative intent behind the phrase "enacted for the purpose of regulating the business of insurance" in the first clause of section 1012(b), the Court applied statutory construction principles, beginning with the plain language of the MFA. *Id.* The Court began by discussing *National Securities*' interpretation of the phrase and its statement that the focus of the MFA is on the relationship between the insurance company and its policyholders. *Id.* at 501 (statutes that focus on protecting or regulating the relationship between the insurer and the insured,

whether directly or indirectly, are considered to be laws "regulating the business of insurance" within the meaning of the MFA). It then analyzed the three *Pireno* criteria "that are relevant in determining what activities constitute the "business of insurance." *Id.* at 502. The Court rejected the petitioners' argument that the Ohio statute failed to satisfy any of the three criteria, stating, "we do not read *Pireno* to suggest that the business of insurance is confined entirely to the writing of insurance contracts, as opposed to their performance." *Id.* at 503. The Court characterized *Royal Drug* and *Pireno* as holding "only that 'ancillary activities' that do not affect performance of the insurance contract or enforcement of contractual obligations do not enjoy the antitrust exemption for laws regulating the 'business of insurance.'" *Id.* (citing *Pireno*, 458 U.S. at 134 n.8). The Court explained that performance of an insurance contract satisfies all the prongs of the *Pireno* test, reasoning that without performance of a policy's terms there is no transfer of the risk, and performance is central to the policy relationship between insurer and insured and is confined to entities within the insurance industry. *Id.* at 504. "There can be no doubt that the actual performance of an insurance contract falls within the 'business of insurance,' as we understood that phrase in *Pireno* and *Royal Drug*." *Id.* at 503. The Court explained that the "broad category of laws enacted 'for the purpose of regulating the business of insurance' consists of laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance," and this broad category "necessarily encompasses more than just the 'business of insurance.'" *Id.* at 505 ("actual performance of an insurance contract is an essential part of the 'business of insurance'") (quoting BLACK'S LAW DICTIONARY 1236, 1286 (6th ed.1990)). The Court reasoned that because the Ohio statute was "aimed at protecting or regulating" the performance of an insurance contract, . . . it follows that it is a law 'enacted for the purpose of regulating the business of insurance'" within the meaning of the first clause of section 1012(b) of the MFA. *Id.*

The Court in *Fabe* ultimately concluded that, with respect to the Ohio statute's preference for policyholders, the law regulated the "business of insurance" and was thus exempted from preemption by the MFA. *Id.* at 508. However, with respect to the statute's preference given to other creditors, the Court held that portion of the statute did not regulate the business of insurance and was preempted by federal bankruptcy law. *Id.* The Court explained its distinction between the priority given to policyholders and that afforded to other creditors, reasoning that the Ohio statute "need not be treated as a package which stands or falls in its entirety," given its "dual goals." *Id.* at 509 n.8 (citing the approach taken in *National Securities*, "which carefully parsed a state statute with dual goals and held that it regulated the business of insurance only to the extent that it protected policyholders").

### *Texas Medical Liability Act (TMLA) – Section 74.451 (Arbitration Agreements)*

The narrow issue presented in the instant appeal is whether Chapter 74, specifically section 74.451, of the Texas Medical Liability Act (TMLA) "was enacted for the 'purpose of regulating the business of insurance,'" thereby bringing it within the MFA's protection against preemption by the FAA. TEX. CIV. PRAC. & REM. CODE ANN. § 74.451. To date, three Texas cases involving health care liability claims against nursing homes have directly addressed the issue, and all three held that the MFA prevents the FAA from preempting the arbitration restrictions in section 74.451 or its predecessor, section 15.01 of article 4590i known as the Texas Medical Liability Insurance Improvement Act. *See* Act of May 25, 1993, 73rd Leg., R.S., ch. 625, § 4, 1993 Tex. Gen. Laws 2347, 2349-50, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884 (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 74.451 (West 2011)).

Noting that it was a matter of first impression, the First Court of Appeals in *In re Kepka* addressed the question of whether article 4590i, specifically section 15.01 governing arbitration agreements, was enacted for the purpose of regulating the business of insurance within the meaning

of the MFA, or whether the FAA preempted section 15.01's restrictions on arbitration. *In re Kepka*, 178 S.W.3d 279 (Tex. App.—Houston [1st Dist.] 2005, orig. proceeding), *disapproved on other grounds by In re Labatt Food Service, L.P.*, 279 S.W.3d 640 (Tex. 2009) (orig. proceeding).[3] There was no dispute that the arbitration agreements at issue did not comply with section 15.01's attorney-signature and boldface notice requirements. *Kepka*, 178 S.W.3d at 288. The defendant nursing home sought to compel arbitration under the FAA in the health care liability lawsuit, arguing that the FAA preempted section 15.01; the plaintiffs responded by arguing that the MFA prohibited preemption by, or "reverse-preempted," the FAA. *Id.* Because application of the FAA was not challenged on appeal, the court noted that it was required to "assume without deciding" that the FAA preempted section 15.01 before it reached the issue of MFA exemption. *Id.* at 288 n.9, 285 n.4 (recognizing *In re Nexion Health*'s holding that Medicare payments constitute interstate commerce and trigger FAA application).

In analyzing whether section 15.01 was "enacted for the purpose of regulating the business of insurance" under the MFA, the court looked to *Fabe* for guidance on the question of what types of laws fall within the "broad category" of laws enacted for the purpose of regulating insurance. *Id.* at 288-89. The court quoted extensively from *Fabe*, recognizing that the MFA focus is on the relationship between the insurer and insured, and that statutes aimed at protecting or regulating this relationship, whether directly or indirectly, are laws regulating the "business of insurance." *Id.* After reciting the applicable law under *Fabe*, the court concluded that article 4590i, including section 15.01, was enacted for the purpose of regulating the business of insurance. *Id.* at 291. The

---

[3] In *Labatt*, the Texas Supreme Court disapproved an alternative holding in *Kepka* that does not affect its preemption analysis. *In re Labatt Food Service, L.P.,* 279 S.W.3d 640, 646 (Tex. 2009) (holding that wrongful death claims brought by non-signatories are subject to an arbitration agreement if the claims from which they derive would have been subject to the arbitration agreement).

court rejected the nursing home's arguments that the goal of section 15.01 was to regulate the relationship between health care providers and their patients, rather than between insurers and insureds, and that section 15.01 should be read "in a vacuum" to determine whether it was enacted for the purpose of regulating the business of insurance. *Id.* at 289. Instead, the court considered the "findings and purposes" section of former article 4590i (section 1.02) which "contained legislative statements that applied to the statute as a whole," indicating it was enacted for the purpose of controlling the escalating costs of professional medical liability insurance. *See id.* at 289-90 (reciting the "findings and purposes" for article 4590i). The court stated that,

> It is clear from former section 1.02 that the purpose of the *entire statute* — even those substantive provisions that did not expressly mention insurance — was to decrease the costs of health-care liability claims, through modifications of the insurance, tort, and medical-practice systems, in order to make insurance reasonably affordable so that health-care providers could have protection against potential liability and so that citizens could have more affordable and accessible health care.

*Id.* at 291. Given that section 15.01 on arbitration agreements was "part of this overall scheme," the court reasoned, "the Legislature not only intended to protect patients by it, but could also have determined that the section's protections could reduce litigation over arbitration agreements' enforceability — thereby keeping down this aspect of litigation cost. Such an intent is at least consistent with the stated purposes . . . ." *Id.* The court concluded that former article 4590i, including section 15.01, was enacted for the purpose of regulating the business of insurance because it "possess[ed] the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance," which is the relationship between health-care insurers and their insureds (health providers)." *Id.* (quoting *Fabe*, 508 U.S. at 505).

Noting that *Kepka* was the only authority it found on the issue, the federal district court in the Eastern District of Texas adopted the First Court of Appeals' reasoning in similarly holding that Chapter 74 was "enacted as a comprehensive effort to regulate medical malpractice liability

insurance premiums," and that section 74.451 was "part-in-parcel of a broader effort to regulate the business of insurance in Texas." *Patterson v. Nexion Health, Inc.*, No. 2-06-CV-443, 2007 WL 2021326, at *2 (E.D. Tex. July 9, 2007). The court repeated *Kepka*'s quote from *Fabe* that, "[t]he class of laws enacted 'for the purpose of regulating the business of insurance' is broad and consists of those laws 'that possess the end, intention, or aim of adjusting, managing, or controlling the business of insurance.'" *Id.* Based on *Kepka* and the absence of any contrary authority, the district court held that section 74.451 was enacted for the purpose of regulating insurance and concluded that, pursuant to the MFA, its requirements for an enforceable arbitration agreement applied. *Id.* at *3. The court concluded that the arbitration agreement at issue was not enforceable because it did not include the signature of the patient's attorney or the boldfaced statutory language required by section 74.451. *Id.*

Finally, in *In re Sthran*, 327 S.W.3d 839 (Tex. App.—Dallas 2010, orig. proceeding), the Dallas Court of Appeals similarly adopted the reasoning used in *Kepka* in holding that the MFA reverse preempts the FAA because section 74.451 is a law regulating the insurance industry. *Id.* at 845-46 ("Assuming without deciding that the FAA could preempt the notice requirement of section 74.451, we conclude the MFA reverse preempts the FAA with regard to such notice requirement in this case."). The Dallas court specifically noted that the wording of the notice requirements of section 15.01 of former article 4590i, construed in *Kepka*, is identical to that used in current section 74.451. *Id.* at 844; *see also Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 n.1 (Tex. 2005) (noting that article 4590i was repealed, amended in part, and re-codified as Chapter 74).

### *Analysis*

We begin our analysis by noting the parties' concession at oral argument that the FAA would preempt section 74.451's restrictions on arbitration unless the MFA exempts the state

statute from preemption. Therefore, as in *Kepka* and *Sthran*, we assume FAA preemption in order to reach the issue of MFA application. *See Kepka*, 178 S.W.3d at 288 n.9; *Sthran*, 327 S.W.3d at 845-46.

Arguing in support of the MFA's application and the trial court's order denying arbitration under the FAA, the Former Residents assert that Chapter 74, including section 74.451, was enacted for the purpose of "regulating the business of insurance for health care providers" within the meaning of the first clause of section 1012(b) of the MFA as interpreted by the United States Supreme Court. They rely on *Fabe* and the three Texas cases, *supra*, that have specifically addressed application of the MFA in the context of arbitration of health care liability lawsuits against nursing home facilities in Texas in urging us to affirm the trial court's order.

The Nursing Facility asserts the trial court erred in denying its motion to compel arbitration under the FAA because section 74.451 is not a law enacted for the purpose of "regulating the business of insurance;" therefore, the MFA does not protect it from preemption and the trial court should have compelled arbitration under the FAA. In support, the Nursing Facility argues that *Kepka* was wrongly decided, and the other two Texas cases that simply rely on *Kepka* are similarly flawed. The Nursing Facility contends *Kepka*'s reasoning is flawed because the court did not correctly apply *Fabe*, and did not analyze the issue with respect to the three *Pireno* factors. It asserts that under a common sense, plain language interpretation, section 74.451 is clearly not an insurance regulation, but rather an "anti-arbitration" law. The Nursing Facility points out that the Texas Insurance Code specifically states that it is intended to comport with the MFA, so the Texas Legislature clearly knows how to identify a law as one regulating the business of insurance. The Nursing Facility stresses that section 74.451 does not reference the term "insurance" at all, does nothing to transfer risk, does not regulate or protect the relationship between insurers and insureds, and its requirements for enforceable arbitration agreements apply equally to non-insured health

care providers as well as insured health care providers. Therefore, it contends section 74.451 fails all three criteria stated in *Pireno*, and also fails the *Fabe* analysis which focuses on whether the law is directed at protecting or regulating the performance of the insurance contract. *See Fabe*, 508 U.S. at 504 (reasoning that performance of an insurance contract satisfies all three *Pireno* criteria).

In *Kepka*, the court declined to apply the "narrower test for determining what constitutes the 'business of insurance'" set forth in *Pireno* and *Royal Drug* because those cases were decided under a different part of the MFA dealing with the business of insurance in the limited context of antitrust laws. *Kepka*, 178 S.W.3d at 291 n.14 (citing *Fabe*, 508 U.S. at 504 & n.6). *Pireno* and *Royal Drug* dealt with the second clause of MFA section 1012(b), which specifically provides an exemption from federal antitrust laws for state laws regulating the business of insurance. *See* 15 U.S.C. § 1012(b) (". . . *Provided*, That after June 30, 1948, the Act . . . known as the Sherman Act, . . . shall be applicable to the business of insurance to the extent that such business is not regulated by State law."); *see also Fabe*, 508 U.S. at 504 (explaining that *Pireno* and *Royal Drug* were decided under the second clause of section 1012(b) of the MFA, while the state statute in *Fabe* was analyzed under the first clause of section 1012(b)). Indeed, the *Pireno* opinion stressed that "our precedents consistently hold that exemptions from the antitrust laws must be construed narrowly." *Pireno*, 458 U.S. at 126. The Supreme Court noted the issue in *Pireno* was controlled by *Royal Drug*, in which the Court first examined the scope of the express antitrust exemption provided for state laws regulating "the business of insurance" under the second clause of section 1012(b) of the MFA. *Id.*; *Royal Drug*, 440 U.S. at 209 (addressing an alleged price-fixing practice by a health insurer who entered into agreements with certain pharmacies to sell its policyholders prescriptions for $2.00). In holding that the pharmacy agreements were not the "business of insurance" within the meaning of the second clause of section 1012(b), the Supreme Court looked

to the structure and legislative history of the MFA and first identified the "three characteristics of the business of insurance" later applied in *Pireno*. *Royal Drug*, 440 U.S. at 211; *Pireno*, 458 U.S. at 127.

While we acknowledge the distinction between the first and second clauses of section 1012(b), we believe a thorough analysis should include consideration of the *Pireno* factors. *See Pireno*, 458 U.S. at 129 (whether the practice or law has the effect of spreading the risk, is integral to the insurer/insured relationship, and is limited to entities within the insurance industry); *see also Fabe*, 508 U.S. at 502 (analyzing the three *Pireno* factors as relevant to the determination of whether an Ohio statute regulated "the business of insurance"). As the Supreme Court noted in *Fabe*, performance of an insurance contract satisfies all three *Pireno* criteria because without performance there is no transfer of risk, and performance of a policy is integral to the insurer/insured relationship and is confined to entities within the insurance industry. *Fabe*, 508 U.S. at 503-04 (declining to read *Pireno* as limiting "the business of insurance" to the writing of insurance contracts, as opposed to the performance of insurance contracts). Under *Fabe*'s reasoning, a state statute aimed at protecting or managing performance of an insurance contract is a law "enacted for the purpose of regulating the business of insurance" within the meaning of the first clause of section 1012(b) of the MFA. *Id.* at 505.

Here, section 74.451 is part of a law enacted for the purpose of protecting and managing the performance of insurance policies in the area of medical malpractice and health care liability, and is therefore within the broad category of laws enacted "for the purpose of regulating the business of insurance" under the first clause of section 1012(b) of the MFA. *See id.* As the Austin Court of Appeals explained in *PM Management-Trinity NC, LLC v. Kumets*, article 4590i was enacted in 1977 with the legislature's stated purpose being to "remedy 'a medical malpractice insurance crisis' in Texas and its 'material adverse effect on the delivery of medical and health

care services in Texas, including significant reductions of availability of medical and health care services to the people of Texas and a likelihood of further reductions in the future.'" *PM Management-Trinity NC, LLC v. Kumets*, 368 S.W.3d 711, 718 (Tex. App.—Austin 2012, pet. filed) (quoting section 1.02(a)(5)-(6) of article 4590i). "In 2003 the legislature replaced [article 4590i] with the TMLA, repeating its 1977 findings and statements of purpose." *Id.* (citing Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 10.01, 10.09, 10.11, 2003 Tex. Gen. Laws 847, 864-82, 884-85); *see Tex. West Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 176-77 (Tex. 2012) (noting that the legislature intended the TMLA's predecessor act, former Tex. Rev. Civ. Stat. Ann. art. 4590i, to be broad, and further broadened the law's scope in 2003 when it enacted the TMLA in response to "another 'medical malpractice insurance crisis'"). The Austin Court of Appeals described the "object sought to be obtained" by Chapter 74 as "to rein in what was perceived to be excessive awards for noneconomic damages that were driving up the cost of medical malpractice insurance, which in turn reduced the number of health-care providers willing to provide services in Texas and the availability of medical and health-care services to the people of Texas." *Kumets*, 368 S.W.3d at 718-19; *see also Aviles v. Aguirre*, 292 S.W.3d 648, 649 (Tex. 2009) (per curiam) (noting that virtually all legislative findings expressed in the statute relate to the cost of malpractice insurance).

The Nursing Facility faults the *Kepka* opinion for considering the purpose of the overall scheme set forth in former article 4590i (predecessor to Chapter 74), and not restricting its consideration to the purpose and effect of the particular statute at issue, i.e., the arbitration provision section 15.01 (now section 74.451). It cites to *Fabe* as support for this "parsing" type of statutory construction. However, *Fabe* clarified in a footnote that the basis for its "parsing" analysis of the Ohio statute was the statute's dual goals in giving priority to policyholders as well as other creditors. *Fabe*, 508 U.S. at 508, 509 n.8. Section 74.451 has no such dual goal. It is

well established that in construing a statute, the court considers the language in the whole context, not in isolation. *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). Moreover, in applying statutory construction principles to the MFA phrase "enacted for the purpose of regulating the business of insurance," the Supreme Court in *Fabe* looked to the history and overall purpose of the MFA as well as the ordinary meaning of the plain language used in section 1012(b). *Fabe*, 508 U.S. at 499-500 (considering the circumstances surrounding enactment of the MFA and the "stated mission" of the MFA as set forth in section 1011); *see Kumets*, 368 S.W.3d at 718 (considering "the history of the times" out of which article 4590i and Chapter 74 arose in interpreting a phrase within the statute).

The Nursing Facility further urges us to reject *Kepka* because it considered the "findings and purposes" statement contained in section 1.02 of article 4590i, arguing the omission of such statement from the statutory text of Chapter 74 must be given meaning. However, even though this preamble was not included within Chapter 74, the legislative history of House Bill 4 contains a legislative statement of the purpose of Chapter 74 which is substantially the same as section 1.02.

Finally, the Nursing Facility argues that the Texas Supreme Court already decided the instant issue in *In re Nexion Health* when it held that an attorney-signature requirement in the Texas Arbitration Act for personal injury cases was preempted by the FAA. *See In re Nexion Health*, 173 S.W.3d at 69. However, the Court in *Nexion Health* did not consider how the MFA affected the preemption analysis. In a supplemental per curiam opinion on motion for rehearing, the Court explicitly declined to address the newly raised issue of whether the MFA prevented the FAA from preempting the TAA's attorney-signature provision because the argument was not presented to the trial court. *Id.* at 70 ("we decline to reach the issue and express no opinion as to the merits of this argument"); *see Sthran*, 327 S.W.3d at 845 (rejecting the nursing home's assertion that the Texas Supreme Court's opinion in *In re Nexion Health* controlled the MFA issue,

noting that the Court expressly did not address whether the MFA reverse preempted the FAA in the case).

<h2 style="text-align:center">CONCLUSION</h2>

Based on the foregoing reasons, we conclude that under the *Fabe/Pireno* analysis, section 74.451 is a law "enacted for the purpose of regulating the business of insurance" within the meaning of the first clause of section 1012(b) of the MFA and is, thus, exempted from preemption by the FAA. As discussed, *supra*, the Texas courts that have considered this question in *Kepka*, *Sthran*, and *Patterson* have all held that section 74.451 was enacted as part of an effort to regulate the business of medical malpractice insurance in Texas. We join those courts. Accordingly, we hold the trial court did not err in denying the Nursing Facility's motion to compel arbitration under the FAA.

Rebeca C. Martinez, Justice