

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-14-00045-CV

---

THE VILLAS OF MOUNT PLEASANT, LLC, D/B/A GREENHILL VILLAS, F/D/B/A VILLAS OF MOUNT PLEASANT, MT. PLEASANT OPERATORS, LLC, AND LLOYD DOUGLAS, Appellants

V.

KYLE KING, INDIVIDUALLY, AS ADMINISTRATOR OF THE ESTATE OF MARILOU WHATLEY KING, DECEASED, AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF MARILOU WHATLEY KING, Appellee

---

On Appeal from the 276th District Court
Titus County, Texas
Trial Court No. 37,338

---

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

# O P I N I O N

Kyle King admitted his mother, Marilou Whatley King (Whatley), to The Villas of Mount Pleasant, LLC, d/b/a Greenhill Villas (the Villas) nursing facility in Mount Pleasant, Texas. Acting as Whatley's agent, King signed an admission agreement containing an arbitration clause that purported to require the parties to arbitrate any controversy arising from the services provided by the Villas to Whatley. Whatley died, and King sued the Villas alleging that her death was caused by its failure to render proper nursing home care and to protect his mother from abuse. Under Section 74.451 of the Texas Civil Practice and Remedies Code, the arbitration agreement, to be enforceable, must contain a conspicuously placed, written notice stating that the agreement is invalid *unless* it is also signed by an attorney chosen by and representing the patient. TEX. CIVIL PRAC. & REM. CODE ANN. § 74.451 (West 2011). The agreement signed by King on Whatley's behalf contained no such notice, and it was not signed by an attorney acting on Whatley's behalf. The trial court found that the arbitration agreement was not enforceable.

The first issue we must resolve is whether the Federal Arbitration Act (the FAA) preempts Section 74.451, thereby rendering it inapplicable to this case. If the FAA does preempt Section 74.451, then we must decide whether the McCarran-Ferguson Act (the MFA) reverse preempts the FAA, thereby negating the FAA's preemptive effect and restoring Section 74.451's applicability to Whatley's agreement with the Villas.

2

## I.     Texas Law on Arbitration Agreements Between Patients and Health Care Providers

Section 74.451 of the Texas Civil Practice and Remedies Code prohibits health care providers from requiring or even requesting that a patient execute an agreement to arbitrate a health care liability claim unless such agreement includes a clear, conspicuous, written notice printed in ten-point, boldface type and stating,

> UNDER TEXAS LAW, THIS AGREEMENT IS INVALID AND OF NO LEGAL EFFECT UNLESS IT IS ALSO SIGNED BY AN ATTORNEY OF YOUR OWN CHOOSING. THIS AGREEMENT CONTAINS A WAIVER OF IMPORTANT LEGAL RIGHTS, INCLUDING YOUR RIGHT TO A JURY. YOU SHOULD NOT SIGN THIS AGREEMENT WITHOUT FIRST CONSULTING WITH AN ATTORNEY.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.451(a). No such provision was included in the agreement at issue in this case.

## II.     Preemption of Texas Law by the FAA

The Villas contends that the FAA preempts Section 74.451 and that, consequently, the FAA governs the enforceability of the arbitration agreement signed by King on Whatley's behalf. The United States Supreme Court has held that the FAA "extends to any contract affecting commerce, as far as the Commerce Clause of the United States Constitution will reach." *In re L & L Kempwood Assocs.*, 9 S.W.3d 125, 127 (Tex. 1999) (citing *Allied-Bruce Terminix Co. v. Dobson*, 513 U.S. 265, 268 (1995)). Stated differently, if an arbitration agreement relates to a transaction involving interstate commerce, then the FAA preempts state law and governs the enforceability of that arbitration agreement. If, on the other hand, the arbitration agreement does not relate to a transaction involving interstate commerce, then state law governs enforceability. The Texas Supreme Court has held that the payment of federal

3

Medicare or Medicaid funds to a Texas health care provider as reimbursement for health care services involves interstate commerce to a sufficient degree to render the transaction between the Texas health care provider and its patient a transaction affecting commerce. *In re Nexion Health at Humble, Inc.*, 173 S.W.3d 67, 69 (Tex. 2005). Consequently, an arbitration agreement between a Texas health care provider and its patient under the above scenario relates to a transaction affecting interstate commerce, and the enforceability of that arbitration agreement is governed by the FAA. *Id.* Here, the Villas participates in the Medicare and Medicaid programs and is obligated to meet certain minimum health and safety standards established by the Department of Health and Human Services. Further, Whatley received monthly Medicare benefits that were used to partially defray the expenses arising from her stay at the Villas. Following the precedent of the Texas Supreme Court and under the facts and circumstances of this case, we hold that the FAA preempts Section 74.451 of the Texas Civil Practice and Remedies Code. *See id.* The remaining question, then, is whether the reverse preemption mechanism contained in the MFA applies under the facts and circumstances of this case.

## III. The MFA and Reverse Preemption

The MFA states, in pertinent part, "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). "The McCarran-Ferguson Act (MFA) provides an exception to . . . preemption if the conflicting state law was enacted 'for the purpose of regulating the business of insurance.'" *Fredericksburg Care Co., L.P. v. Perez*, 406 S.W.3d 313, 318 (Tex. App.—San Antonio 2013,

4

pet. granted) (quoting 15 U.S.C. § 1012(b)).  Three conditions must be satisfied to invoke the MFA's preemption exception:  (1) the federal statute at issue—here, the FAA—must not "specifically relate[] to the business of insurance," (2) the state statute at issue—here Section 74.451 of the Texas Civil Practice and Remedies Code—must have been "enacted . . . for the purpose of regulating the business of insurance," and (3) application of the federal statute must "invalidate, impair, or supersede" the state statute.  15 U.S.C. § 1012(b); *Perez*, 406 S.W.3d at 318 (citing *United States Dep't of Treasury v. Fabe*, 508 U.S. 491, 500–01 (1993); *Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 590 (5th Cir. 1998)).  The first and third conditions are unquestionably met in the case; the issue we must decide is whether Section 74.451 was enacted for the purpose of regulating the business of insurance.

The San Antonio Court of Appeals recently addressed this issue in *Perez*, where several former patients sued a nursing home alleging negligence and gross negligence.  After carefully analyzing the issues related to reverse preemption and the MFA, the San Antonio Court found that "section 74.451 is a law 'enacted for the purpose of regulating the business of insurance' within the meaning of the first clause of section 1012(b) of the MFA and is, thus, exempted from preemption by the FAA."  *Perez*, 406 S.W.3d at 325–26 (quoting 15 U.S.C. § 1012(b)).[1]  In reaching this decision, the San Antonio Court relied heavily on *In re Kepka*, 178 S.W.3d 279 (Tex. App.— Houston [1st Dist.] 2005, orig. proceeding), *overruled in part on other grounds by*

---

[1]San Antonio applied the same reasoning to reach the same result in two additional opinions issued the same day as *Perez*:  *Fredricksburg Care Co., L.P. v. Lira*, 407 S.W.3d 810 (Tex. App.—San Antonio 2013, pet. filed), and *Williamsburg Care Co., L.P. v. Acosta*, 406 S.W.3d 711 (Tex. App.—San Antonio 2013, pet. filed).

*Labatt Food Serv., L.P.*, 279 S.W.3d 640 (Tex. 2009).[2]  *Kepka* was the first case to address the interplay of Section 74.451, the FAA, and the MFA, albeit in the context of Section 74.451's predecessor, Article 4590i, Section 15.01 of the Texas Medical Liability Insurance Improvement Act.[3]

In analyzing Article 4590i, the *Kepka* court took note of the findings and purposes underlying its enactment and found,

> It is clear . . . that the purpose of the *entire statute* — even those substantive provisions that do not expressly mention insurance — was to decrease the costs of health-care liability claims through modifications of the insurance, tort, and medical-practice systems, in order to make insurance reasonably affordable so that health-care providers could have protection against potential liability and so that citizens could have more affordable and accessible health care.

*Kepka*, 178 S.W.3d at 291.  The *Kepka* court concluded that Article 4590i, including Section 15.01, was enacted to regulate the business of insurance.  *Id.* at 289.  Consequently, the *Kepka* court held that the MFA's exception was triggered, reversing the FAA's preemptive effect on Texas' arbitration notice requirements.  *Id.*

### A.     Review of Entire Statutory Scheme or Individual Parts?

The Villas criticizes the reasoning of *Kepka* and *Perez*, labeling it an "all or nothing approach."   Indeed, the *Kepka* and *Perez* opinions considered the purpose of the TMLA—or its predecessor in *Kepka*—in its entirety and found that the purpose behind the legislation, as a whole, was to address issues of medical malpractice and the perception that professional liability

---

[2]The Dallas Court of Appeals applied the reasoning of *Kepka* in reaching the same result in *In re Sthran*, 327 S.W.3d 839 (Tex. App.—Dallas 2010, orig. proceeding), as did the Federal District Court for the Eastern District of Texas in *Patterson v. Nexion Health, Inc.*, No. 2-06-CV-443, 2007 WL 2021326 (E.D. Tex. July 9, 2007).

[3]*See* Act of May 25, 1993, 73d Leg., R.S., ch. 625, § 4, 1993 Tex. Gen. Laws 2347, 2349–50, repealed by Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

insurance was either too expensive or entirely unavailable. The Villas contends that the better approach is to analyze Section 74.451, which limits the creation of arbitration agreements between health care providers and patients, in isolation.

The TMLA was unquestionably enacted as a part of the tort reform movement in Texas, and it was clearly intended to affect liability insurance rates paid by health care providers. However, it is also true that the particular subsection with which we are confronted does not specifically address the business of insurance; rather, Section 74.451 is a significant encumbrance on the rights of certain parties—health care providers and their patients—to enter into arbitration agreements. In fact, it is reasonable to conclude that Section 74.451 favors litigation—generally thought to increase insurance premiums—over arbitration. The conundrum, obviously, is determining whether we should look specifically at Section 74.451 or to the larger body of legislation of which it is a subpart in determining whether the statute was enacted for the purpose of regulating the business of insurance.

In *Labor Life Insurance Co. v. Pireno*, 458 U.S. 119 (1982), a chiropractor sued an insurance company alleging that the company was using a peer review committee to examine whether his treatment was reasonable and necessary. The allegation was that the peer review system violated the Sherman Act and was a conspiracy to eliminate competitive pricing. *Id*. The issue confronting the *Pireno* court was whether the MFA exempted the practice of using peer review committees from antitrust scrutiny. If the MFA's exception was to apply, then the peer review practice would have to be deemed a part of the "business of insurance." The United States Supreme Court found that the use of peer review committees was not part of the business of

7

insurance and that the MFA's exception did not apply. *Pireno* discussed three criteria, first applied in *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 211–12 (1979), relevant in determining whether a particular practice by an insurance company is part of the business of insurance: "(1) the practice has the effect of transferring or spreading a policyholder's risk, (2) the practice is an integral part of the policy relationship between the insurer and the insured; and (3) the practice is limited to entities within the insurance industry." *Pireno*, 458 U.S. at 129 (citing *Royal Drug Co.*, 440 U.S. 205, 211–12 (1979)).

In *United States Department of Treasury v. Fabe*, 508 U.S. 491 (1993), an insurance company in Ohio was declared insolvent. A liquidator was appointed, and the United States filed claims in excess of $10,700,000.00. Under federal law, the United States' claims were entitled to first priority, but under an Ohio statute, the insurance company's policyholders were given first priority over the United States. The liquidator argued that the Ohio law was an act regulating the business of insurance and that the MFA's exception applied, meaning Ohio law governed the issue of priorities. *Id.* at 497. The United States Department of the Treasury argued that the liquidation of an insolvent insurance company was not part of the business of insurance and that, as a result, the MFA had no effect on the Sherman Act's preemption of Ohio state law.

The United States Supreme Court applied the *Pireno* test to the facts of *Fabe* and concluded,

> There can be no doubt that the actual performance of an insurance contract falls within the "business of insurance," as we understood that phrase in *Pireno* and *Royal Drug*. To hold otherwise would be mere formalism. The Court's statement in *Pireno* that the "transfer of risk from insured to insurer is effected by means of

8

the contract between the parties . . . and . . . is complete at the time that the contract is entered" presumes that the insurance contract in fact will be enforced. Without performance of the terms of the insurance policy, there is no risk transfer at all. Moreover, performance of an insurance contract also satisfies the remaining prongs of the *Pireno* test: It is central to the policy relationship between insurer and insured and is confined entirely to entities within the insurance industry. The Ohio priority statute is designed to carry out the enforcement of insurance contracts by ensuring the payment of policyholders' claims despite the insurance company's intervening bankruptcy. Because it is integrally related to the performance of insurance contracts after bankruptcy, Ohio's law is one "enacted by any State for the purpose of regulating the business of insurance."

*Fabe*, 508 U.S. at 503–04 (quoting *Pireno*, 458 U.S. at 130; 15 U.S.C. § 1012(b)). However, the *Fabe* court limited its finding on the applicability of the MFA to the Ohio priority statute's regulation of policyholders when it stated, "The Ohio statute is enacted 'for the purpose of regulating the business of insurance' to the extent that it serves to ensure that, if possible, policyholders ultimately will receive payment on their claims." *Id.* at 506. The court drew a sharp distinction between the interests of policyholders, on the one hand, and those of general creditors who were not policyholders, on the other. The Court stated, "To the extent that it is designated to further the interests of other creditors, however, it is not a law enacted for the purpose of regulating the business of insurance." *Id.* at 508. It is this language from *Fabe* concerning the interests of non-policyholder creditors that we find critical to the case at hand.

According to the Villas, *Fabe* requires that we analyze individual sections or subsections that are clearly part of a larger statutory framework in a vacuum. In other words, the Villas posits that, under *Fabe*, we must examine Section 74.451 in isolation, without reference to or consideration of the legislative intent behind the TMLA, the larger statutory framework of which Section 74.451 is a part. The Villas points to *Fabe*'s limited holding—"to the extent [the Ohio

9

statute at issue] . . . regulates policyholders, [it] is a law enacted for the purpose of regulating the business of insurance." *Id.* at 508. However, "[t]o the extent [the statute] is designed to further the interests of other creditors . . . it is not a law enacted for the purpose of regulating the business of insurance." *Id.* By analogy, the Villas argues that, even if the overall purpose of the TMLA was to affect policyholders and rates, the purpose of this particular statute had no effect on the business of insurance.

In support of its narrow interpretation of *Fabe*, the Villas directs us to footnote eight, where the majority answered some of the dissent's criticisms:

> The dissent assails our holding at both ends, contending that it at once goes too far and not quite far enough. On the one hand, the dissent suggests that our holding is too "broad" in the sense that "any law which redounds to the benefit of policyholders is, *ipso facto*, a law enacted to regulate the business of insurance." Post, at 511. But this is precisely the argument we reject in the text, as evidenced by the narrowness of our actual holding. Uncomfortable with our distinction between the priority given to policyholders and the priority afforded other creditors, the dissent complains, on the other hand, that this is evidence of a "serious flaw." Post, at 517. But the dissent itself concedes that a state statute regulating the liquidation of insolvent insurance companies need not be treated as a package which stands or falls in its entirety. Post, at 518. Given this concession, it is the dissent's insistence upon an all-or-nothing approach to this particular statute that is flawed. The dissent adduces no support for its assertion that we must deal with the various priority provisions of the Ohio law as if they were all designed to further a single end. That was not the approach taken by this Court in *National Securities*,[4] which carefully parsed a state statute with dual

---

[4]*SEC v. Nat'l Secs., Inc.*, 393 U.S. 453 (1969). Two Arizona insurance companies had merged with approval of the Arizona Director of Insurance as required by state law; the SEC sued to rescind the merger for alleged material misrepresentations, and the insurance companies invoked the MFA in arguing that federal securities law did not apply because the relevant Arizona law concerned the business of insurance. The United States Supreme Court found that the MFA's preemption exception did not apply. In the words of the Court, "[The] core of the 'business of insurance'" under the MFA is "[t]he relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement." *Id*. at 460. Without elaborating, the Court also recognized that, "[u]ndoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class." *Id*. Finally, the Court stated that, "whatever the exact scope of the

goals and held that it regulated the business of insurance only to the extent that it protected policyholders. *Supra*, at 502. And the dissent misinterprets our pronouncement on the clash of priorities as a "compromise holding," Post, at 517, forgetting that the severability of the various priority provisions is a question of state law.[5]

*Fabe*, 508 U.S. at 509, n.8.

In holding that the result in *Fabe* was based on the dual goals of the Ohio statute, *Perez* rejected the argument that *Fabe* mandates a particularized parsing approach in determining whether a particular statute is governed by the MFA:

> [Appellant nursing facility] cites to *Fabe* as support for this "parsing" type of statutory construction. However, *Fabe* clarified in a footnote that the basis for its "parsing" analysis of the Ohio statute was the statute's dual goals in giving priority to policyholders as well as other creditors. *Fabe*, 508 U.S. at 508, 509 n.8. Section 74.451 has no such dual goal.

*Perez*, 406 S.W.3d at 325.

We reject this reading of *Fabe*. *Fabe* teaches that the entirety of a statute need not be treated in such a way as to overlook the particularized goals of discrete statutory provisions. Here, for example, the overarching goal of the TMLA is undoubtedly to reduce medical malpractice liability insurance premiums. It is apparent, however, that not every section of the Act explicitly advances that goal. Indeed, the particularized goal of Section 74.451—ensuring that patients are explicitly notified of their rights before signing an arbitration agreement—has nothing to do with

---

statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder." *Id*.

[5]In a concurring opinion, Chief Justice Roberts explicitly recognized the precedential value of footnotes by stating that "footnotes are part of an opinion, too." *United States v. Denedo*, 556 U.S. 904, 921(2009). The precedential value of footnotes has been implicitly recognized in dissenting opinions based solely on footnotes. *See, e.g.*, *Fry v. Pliler*, 551 U.S. 112 (2007) (Breyer, J., joining the majority except as to footnote 1 and Part II-B); William A. Ramsey, *Taking Note of Footnotes: The Precedential Value of Footnotes in Judicial Opinions*, RES GESTAE, Sept. 2010, at 10.

regulating the business of insurance.  Taking our guidance from *Fabe*, we do not believe the entirety of the TMLA must be treated as advancing a single, unitary purpose.  Other cases have taken this approach.  For example, the Austin Court of Appeals in *Everest Reinsurance Co. v. Howard*, 950 S.W.2d 800 (Tex. App.—Austin 1997, writ denied), relied on *Fabe* in holding that the now repealed Article 21.28, Section 4(h) of the Texas Insurance Code was "not a law enacted 'for the purpose of regulating insurance. . . .'"  *Id.* at 803; *see* Act of June 1, 1987, 70th Leg., R.S., ch. 1073, § 33, sec. 4(h), 1987 Tex. Gen. Laws 3610, 3649, *repealed by* Act of May 24, 2005, 79th Leg., R.S., ch. 727, § 18(a)(6), 2005 Tex. Gen. Laws 1752, 2187.  Under Section 4(h), the filing of a delinquency proceeding against an insurer or a receiver in a Texas receivership court made that specific court the exclusive venue for all actions or proceedings filed thereafter relating to that insurer or receiver.  Act of June 1, 1987, 70th Leg., R.S., ch. 1073, § 33, sec. 4(h), 1987 Tex. Gen. Laws 3610, 3649 (repealed 2005).  In *Howard*, a delinquency proceeding was filed against an insolvent reinsurance company (Company 1), and a receiver was appointed to conduct Company 1's affairs.  The receiver filed a complaint against another reinsurance company (Company 2) for monies allegedly due to Company 1.  Company 2 removed the case to federal court, and the receiver fought removal by arguing that Section 4(h) was enacted for the purpose of regulating the business of insurance and that, consequently, under the MFA, Section 4(h) was excepted from preemption by the federal removal statute.  In rejecting this argument, the Austin Court stated,

> The exclusive venue provision of section 4(h) does not affect the relationship between insurance companies and their policyholders; it merely designates a forum in which disputes concerning insolvent insurers can be heard.  The substantive rights and responsibilities of insurers and their policyholders can be

> protected in either state or federal court. Accordingly, because section 4(h) of the Receivership Statute is not a law enacted "for the purpose of regulating insurance," the McCarran-Ferguson Act does not apply and cannot preempt the federal removal statute.

*Id.* at 803; *see also Langdeau v. United States*, 363 S.W.2d 327 (Tex. Civ. App.—Austin 1962, no writ) (holding that provision of Texas Insurance Code did not regulate business of insurance but established priority for class of creditors of insurance company). While the Insurance Code, when considered collectively and in broad, general terms, was obviously intended to regulate the business of insurance, the Austin Court of Appeals twice looked beyond the collective intent to the actual intent and effect of specific subsections of the Insurance Code to determine that those specific subsections were not enacted for the purpose of regulating insurance. We agree with the approach and reasoning employed by our sister court in Austin.

In *Fabe*, the statute in question was a part of the Ohio Insurance Code. In determining whether the MFA's exception was triggered, the Supreme Court specifically examined the priority of claims statute, not the entirety of the Ohio Insurance Code. In analyzing that particular statute, the Supreme Court noted the differing goals for different sections of the same statute; one section was designed for the regulation of the business of insurance, and another section was not.

In the face of a "medical malpractice insurance crisis," the Legislature broadened the scope of Article 4590i and recodified it as Chapter 74 of the Texas Civil Practice and Remedies Code. *Tex. West Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 176–77 (Tex. 2012) (citing Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11(a)(5), 2003 Tex. Gen. Laws 847, 884). Even so, Section 74.451 does not specifically address the regulation of the business of insurance.

13

This section has nothing to do with the relationship between insurers and insureds and is not integral to that relationship. *Cf. Fabe*, 508 U.S. at 504. Laws which would fall within the MFA's ambit include those

> enacted "for the purpose of regulating the business of insurance" . . . [which] possess the "end, intention, or aim" of adjusting, managing, or controlling the business of insurance. BLACK'S LAW DICTIONARY 1236, 1286 (6th ed. 1990). This category necessarily encompasses more than just the "business of insurance." . . . [W]e believe that the actual performance of an insurance contract is an essential part of the "business of insurance." Because the Ohio statute is "aimed at protecting or regulating" the performance of an insurance contract, *National Securities*, 393 U.S. at 460, it follows that it is a law "enacted for the purpose of regulating the business of insurance," within the meaning of the first clause of § 2(b).

*Fabe*, 508 U.S. at 505. Section 74.451 does not fit the definition adopted in *Fabe*.

Finally, even if Section 74.451 has a tangential effect on insurance contracts, any such indirect effect is insufficient to trigger the MFA's preemption exception. The United States Supreme Court's rejection of this argument in *Fabe* is instructive:

> Of course, every preference accorded to the creditors of an insolvent insurer ultimately may redound to the benefit of policyholders by enhancing the reliability of the insurance company. This argument, however, goes too far: "But in that sense, every business decision made by an insurance company has some impact on its reliability . . . and its status as a reliable insurer." *Royal Drug*, 440 U.S. at 216–17. *Royal Drug* rejected the notion that such indirect effects are sufficient for a state law to avoid pre-emption under the McCarran-Ferguson Act. *Id*. at 217.

*Fabe*, 508 U.S. at 508–09.

14

In light of the foregoing, we reverse the trial court's judgment and remand this case for further proceedings consistent with this opinion.


                                        Jack Carter
                                        Justice

Date Submitted:        September 24, 2014
Date Decided:          December 31, 2014